WILLIAMS *v.* BAKER.

CEDAR RAPIDS RAILROAD CO. *v.* DES MOINES NAVIGATION CO.

1. The history given of the legislation of the land grants for the improvement of the Des Moines River, and of the grants for railroad purposes, which have been supposed to conflict.

2. This court on full consideration affirms the decision in the cases of *Wolcott* v. *The Des Moines Company* (5 Wallace, 681), and *Reily* v. *Wells* (declared by this court to have nothing to distinguish it from that case, and therefore not reported), namely, "that the title to those lands never passed to the railroad company by the grant under which it claimed, because, by the express terms of the proviso, they were reserved from the grant; and that by the Joint Resolution of Congress of 1861, and the act of 1862, on the same subject, the State of Iowa did receive the title for the use of those to whom she had sold them as part of the original Des Moines River grant."

3. The decision of *Wolcott* v. *The Des Moines Company*, as an authoritative exposition of the law of this case, is not weakened by the supposed collusion of the parties to that suit, it being shown by the record that all the questions were fully argued by other parties who intervened, and that the court maturely and deliberately considered the question which they were now asked to reconsider. Nor does this court look with approval upon a labored effort to prove by testimony that its judgment was obtained by collusion, when the judgment is cited in another case only to establish principles of law, and not by way of evidence or estoppel.

[Though the two cases here reported were decided in order of time prior to that of the *Homestead Company* v. *Valley*

*Railroad* next in order of place (beginning on page 153), and are referred to in it, yet the reader who is not already acquainted with the facts of what is known in Iowa as the Des Moines River land litigation may, possibly, find it as well to read, before reading the cases now immediately given, the later one, beginning, as already said, on page 153, and in which a diagram will assist his comprehension of a topography common to both cases.]

ON appeals from the Circuit Court for the District of Iowa.

These were two suits in chancery, brought originally in the State courts of Iowa, and transferred to the Circuit Court of the United States for that district, to quiet title to real estate. In the first case the complainant was Baker, who held title under the Des Moines Navigation and Railroad Company. The defendant was Williams, and he held under the Cedar Rapids Railroad Company. In the second case, the Cedar Rapids Railroad Company was complainant, and the Navigation and Railroad Company, with others, defendants; and in this suit the complainant set up that suits at law had been commenced against numerous persons, its grantees, which were harassing and expensive, and prayed that its title and the title of its said grantees should be quieted. The defendants in that suit denied the title thus set up, and alleged that their own title, that of the Des Moines Navigation and Railroad Company, was the true title. The court below decided, in both cases, in favor of the parties claiming under the latter title, and in both cases the adverse side appealed to this court.

*Messrs. I. Cook and B. R. Curtis*, for the title under the Cedar Rapids Railroad Company; *Mr. T. F. Withrow, contra*, for that under the Des Moines Company.

Mr. Justice MILLER delivered the opinion of the court.

The foundations of the title on each side of this controversy rest on acts of Congress, and the decision of the cases requires their construction. The cases are identical, except that as the holder of each of the conflicting titles becomes

plaintiff in turn, he is thrown upon the strength of his own title, rather than the weakness of the opposing one.

The title of Baker has its inception in the act of August 8th, 1846, the material part of which is in these words:

"There is hereby granted to the Territory of Iowa, for the purpose of aiding said Territory in improving the navigation of the Des Moines River from its mouth to the Raccoon Fork, so called, in said Territory, one equal moiety in alternate sections of the public lands remaining unsold and not otherwise disposed of, incumbered, or appropriated, in a strip five miles in width on each side of said river, to be selected within said Territory by an agent or agents, to be appointed by the governor thereof, subject to the approval of the Secretary of the Treasury of the United States."

It was also provided that the lands should become the property of the State of Iowa on her admission as such into the Union, which was soon expected.

The State of Iowa passed laws for the work of improving the navigation of the river, which contemplated a series of locks and dams, and after prosecuting the work for some time under a State board of public works, made a contract with a corporation called the Des Moines Navigation and Railroad Company for the further progress of this improvement. By this contract the lands of the Congressional grant, which constituted the sole fund for making the improvement, were to be conveyed by the State to the company, at fixed prices, as they earned them in the progress of the work.

The Secretary of the Treasury, as the lands were selected by the agent of the State and the selections approved by him, certified the approved lists to the State, and this was, and always has been, considered the appropriate mode of evidencing the title of the State under the grant. The State conveyed by patent to the navigation company the lands so certified as the progress of the work authorized it, according to the terms of the contract. All the lands in controversy here have been so certified to the State by the Secre-

tary of the Treasury, or of the Interior, to which depart-
ment, on its organization, that matter was transferred.

But in the progress of the work, and after the lands lying
between the mouth of the river and the Raccoon Fork had
been nearly or entirely exhausted, a question arose in the
land department whether the grant included any lands above
that point. This was a very important question, for, if it
did not, the whole scheme was a failure, much the larger
portion of the lands below that point having been entered by
individuals before the passage of the act, and the river being
quite as long, or longer, above the fork, and within the State,
than below.

This question was the subject of opposing decisions by at
least three secretaries and as many attorneys-general, and
occupied several years of negotiation between the State and
the department. At one period of the controversy the lands
were all certified to the State by the secretary, Mr. Stuart.

While this controversy was going on between the State
of Iowa and the department, Congress passed the act of
1856, which will be more fully considered hereafter as the
source of title of the Cedar Rapids Company, by which there
was granted to the State of Iowa alternate sections of land
for building several railroads across the State east and west,
which roads run through the lands we have been speaking
of as in controversy under the act of 1846.

In 1857 or 1858, Mr. Litchfield, who had such title as the
navigation company could give under the State of Iowa,
brought a suit in the Circuit Court of the United States to
recover possession of a tract of these lands, in which he was
resisted by the Dubuque and Pacific Railroad Company, one
of the beneficiaries under the railroad grant of 1856, and
that suit coming to this court,* it was here held that the
original grant did not extend above the Raccoon Fork,
and that the acts of the Secretary of the Interior in certify-
ing such lands to the State of Iowa were void and conferred
no title, and that Mr. Litchfield had none.

* 20 Howard, 66.

This decision was received as a final settlement of the long-contested question of the extent of the grant. But it left the State of Iowa, which had made engagements on the faith of the lands certified to her, in an embarrassed condition, and it destroyed the title of the navigation company to lands of the value of hundreds of thousands of dollars, which it had received from the State for money, labor, and material actually expended and furnished. What was also equally to be regretted was, that many persons, purchasers for value from the State or the navigation company, found their supposed title an invalid one.

This decision was made and published in 1860, and to remedy the grave evils above mentioned, Congress, on the 2d day of March, 1861, passed a joint resolution in the following words:

"*Resolved*, That all the title which the United States still retain in the tracts of land along the Des Moines River, and above the mouth of the Raccoon Fork thereof, which have been certified to said State improperly by the Department of the Interior as part of the grant by act of Congress, approved August 8th, 1846, and which is now held by *bonâ fide* purchasers under the State of Iowa, be, and the same is hereby relinquished to the State of Iowa."

To show still further the intention of Congress to make good to the State as far as possible all that was claimed by her under the original grant, Congress passed an act, approved July 12th, 1862, by which the grant was in express terms extended to the northern boundary of the State, and as some of the lands had been sold by the United States, provision was made for the selection of an equal quantity of lands of the government in any other part of the State.

This legislative history of the title of the State of Iowa, and of those to whom she had conveyed the lands certified to her by the Secretary of the Interior as part of the grant of 1846, including among her grantees the Des Moines Navigation and Railroad Company, needs no gloss or criticism to show that the title of the State and her grantees is per-

fect, unless impaired or defeated by some other and extrinsic matter which would have that effect.

Such matter is supposed to be found in the act of 1856, already referred to, granting lands to the State of Iowa to aid in building railroads. The argument is, that as by the true construction of the act of 1846 none of the lands above the Raccoon Fork were granted for the improvement of the river, the grant of 1856 covered all the lands erroneously certified to the State under the former, which came within the descriptive terms of the latter grant.

This argument is undoubtedly sound so far as it goes, upon the theory that the State of Iowa had no title in 1856 to the lands in question, and that it was in the power of Congress to grant the lands to railroads. And the whole argument may be simplified and the question at issue narrowed by the concession, that unless these lands are excepted out of the grant of 1856 by a proviso in that act, the railroad companies did get the title of the government by that act, and by the subsequent location of their lines of road so as to include the lands in controversy.

That proviso is in the following language:

"*And provided further*, That any and all lands heretofore reserved to the United States by any act of Congress, or in any other manner by competent authority, for the purpose of aiding in any object of internal improvement, or for any other purpose whatsoever, be, and the same is hereby, reserved to the United States from the operation of this act, except so far as it may be found necessary to locate the routes of said railroads through such reserved lands, in which case the right of way only shall be granted, subject to the approval of the President of the United States."

The effect of this proviso upon the title asserted in these suits under the railroad companies, to the lands certified to the State of Iowa as part of the river improvement grant, has been passed upon by this court in three different cases, and in each of them it has been held that all these lands were, at the time of the passage of the act of 1856, *reserved* within the meaning of the proviso, and that therefore no

title passed to the State or to the railroad companies. It is not pretended that any title has been acquired by any other grant, or in any other manner.

It would seem that this should close the present controversy without further argument. But counsel have not hesitated to ask a reconsideration of the principles involved in those decisions; and the great value of the lands, the title to which must be governed by them, as well as the character of some of the reasons urged against their conclusiveness, have induced us to listen attentively to the oral argument on that subject, and to consider with deliberation and care all that has been presented on that point in writing.

The first and the leading case on the subject is that of *Wolcott* v. *The Des Moines Company.** It was a suit brought by Wolcott against the Des Moines Navigation Company, on a covenant of warranty of title, which it was alleged had failed under the decision in the case of *Litchfield* v. *The Dubuque and Pacific Railroad Company*. This court, in the Wolcott case, decided two propositions: 1st, that by reason of the proviso in the act of 1856 the railroad companies acquired no title to these lands; and 2d, that by the joint resolution of 1861 the title erroneously certified to the State, under the act of 1846, was validated and made good, and that therefore Wolcott had no cause of action on his covenant of warranty.

It is now said that Wolcott and the navigation company were in collusion to procure this decision, there being no real contest between them, and that the object was to procure from this court a decision adverse to the title of the railroad companies, none of whom were parties to the suit. Much evidence is found in the record of the cases now before us as heard in the Circuit Court to establish and to refute this allegation. We do not here intend to pass upon it, and we must be permitted to question both the taste and legal competency of testimony offered in an inferior court, to show that a decision in this court was obtained by fraudulent de-

* 5 Wallace, 681.

vices, when that decision is not relied on as evidence of any fact, or pleaded as an estoppel, but merely because it may . be referred to as settling a principle of law applicable to the case at bar.

There is in the record of that case, as it remains in this court, sufficient answer to this objection to the opinion as an authority on the law of this case.

The writer of this opinion, though then a member of the court, declined to take any part in its decision because he had been of counsel for the navigation company in a general way, and did not know how far he might have been engaged in that case. But when it was submitted on printed arguments on both sides, he saw at once that the legal propositions involved did affect materially the title of several railroad companies in Iowa to the lands in question, and he felt it to be his duty to call the attention of those of his brethren who must decide the case to that fact. On this suggestion an order was made that those companies be notified of the pendency of that suit, with liberty to intervene and be heard on the question in which they were interested. They did intervene. The case was postponed for over a year, and several arguments were submitted in favor of the railroad companies by-able counsel, on the very question now under consideration, and an order was made inviting all parties interested to do so. It was after a full consideration of all these arguments that the decision was made. But there was an additional security that the court would carefully consider the question in the fact that there was submitted at the same time the case of *Burr* v. *The Des Moines Navigation and Railroad Company* on a similar warranty of title. Now, though both suits were decided in the Circuit Court for the Southern District of New York, they were decided by different judges, and the decisions were in conflict. This of itself would demand of the court a careful consideration of the point of difference, which was the very point now under consideration.

The same question precisely came up shortly afterwards in the case of *Harriet Reily* v. *W. B. Wells*, and was again

fully argued, and from the opinion of the court, which remains on file, though unreported, the following language is taken: "The reasons for this withdrawal of the lands from public sale, or private entry, are stated at large in the opinion of the court in *Wolcott* v. *The Des Moines Company*, and need not be repeated. The point of the reservation was very material in that case, and we have seen nothing in the present one, either in the facts or in the arguments, to distinguish it." Whatever, therefore, may have been the design of the original parties to the suit of *Wolcott* v. *The Des Moines Company*, it is clear that the question here involved was argued fully by parties deeply interested on both sides, and received the attentive consideration of the court, and as an authoritative exposition of its views is entitled to the same weight as other well-considered cases.

We do not propose to review or add to the able and, to us, satisfactory argument of the judge who delivered that opinion, as well as the one in *Reily* v. *Wells*, but will notice the only new legal proposition advanced by counsel in the present case.

It is attempted to be shown that the proviso on which so much depends was one which in almost the same words it has been usual to insert in all grants of a similar character by Congress. And it is argued that, therefore, it could have no special reference in the mind of Congress to the lands certified under the act of 1846. If, however, this were conceded, it must remain true that the effect of the proviso was to cover such cases as came within its terms, whether known or unknown to Congress, and the opinion in the case referred to shows how distinctly those lands did come within the language and spirit of the proviso. So clear is this that it still seems to us that Congress did know of this reservation, and did intend to protect it as stated in that opinion.

We, therefore, reaffirm, first, that neither the State of Iowa, nor the railroad companies, for whose benefit the grant of 1856 was made, took any title by that act to the lands then claimed to belong to the Des Moines River grant of 1846; and, second, that by the joint resolution of 1861,

and the act of 1862, the State of Iowa did receive the title for the use of those to whom she had sold them as part of that grant, and for such other purposes as had become proper under that grant.

The decrees in both cases are accordingly

AFFIRMED.

Mr. Justice DAVIS did not take part in this decision, on account of a supposed interest in the question; and Mr. Justice BRADLEY did not sit on the hearing.