HOMESTEAD COMPANY v. VALLEY RAILROAD.

1. In this case the court decides, for the fifth time, that neither the State of Iowa nor any railroad company for whose benefit the act of Congress of May 15th, 1856 (11 Stat. at Large, 9), was made, took any title to the lands then claimed by the Des Moines Navigation and Railroad Company, under what is known as the River Grant of August 8th, 1846 (6 Id. 77); and that the joint resolution of March 2d, 1861 (13 Id. 543), and the act of July 12th, 1862 (12 Id. 25), on this subject transferred the title from the United States and vested it in the State of Iowa for the use of its grantees under the said River Grant.

2. Neither the railroad companies nor their grantees, as respected any lands granted by the said act of May 15th, 1856, or by the act of the legislature of Iowa, passed July 14th, 1856, were cestui que trusts of what are called the Indemnity Lands, which were granted by the act of Congress of July 12th, 1862; nor in view of the action of the officers of Iowa and of the Federal government on the subject, and of the subsequent legislation of the said State and of Congress on it, were they entitled otherwise to any portion of those lands.

3. A party who has no title to lands cannot acquire one by mere payment of taxes on them.

4. A party by paying taxes which another party ought to pay, but does not pay, cannot make such second party his debtor by having stepped in and paid the taxes for him, without being requested so to do.

APPEAL from the Circuit Court for the District of Iowa; the case being thus:

On the 8th of August, 1846, Congress granted* to the then Territory, and now State, of Iowa—

---

* 9 Stat. at Large, 77.

"For the purpose of aiding said Territory to improve the navigation of the Des Moines River, from its mouth to the Raccoon Fork, so called, in said Territory, one equal moiety, in alternate sections, of the public lands, in a strip five miles in width, on each side of said river."

The second section of this act provided that the lands so granted should not be sold or conveyed by the Territory, nor by any State to be formed out of it, except as the improvements progressed; that is, that sales might be made so as to produce the sum of $30,000, and then cease until the governor of the Territory, or State, as the case might be, should certify to the President of the United States the fact that one-half of this sum had been expended on said improvements, when sales again might be made of the remaining lands sufficient to replace this amount. The sales were thus to progress as the proceeds were expended, and the expenditure so certified to the President.

After this grant to the State of Iowa, sometimes called

" the river grant," the legislature incorporated the Des Moines Navigation and Railroad Company, for the purpose of carrying out the improvement for which the lands had been granted ; and the lands, with some exceptions, stated *infra*, page 157, were conveyed to that company.

Somewhere near the middle of the State, at Des Moines City, the Des Moines River receives as a tributary a stream called the Raccoon Fork. It thus happens that about one-half the river is above the point where this fork enters and one-half below. Each half traverses, of course, a region of great extent and value.

From the phraseology of the above-quoted grant of Congress, it is obvious that a controversy was susceptible of being raised; the point open to question being, whether Congress meant to grant to the State land on the Des Moines River above the *point* where the Raccoon Fork enters, as well as the land below this point, or whether it meant to grant only land below. On the one hand, the grant was for the purpose of improving the navigation of the river " from its mouth TO the Raccoon Fork." On the other, the grant itself was of one equal moiety, &c., " on each side of the said river."

As early as February, 1848, a controversy assumed form : and what was the true meaning of the grant was a question which came before a succession of officers of the United States, commissioners of the land office, secretaries of the treasury, secretaries of the interior, and attorneys-general. Some of these thought that the grant did not extend above the fork. Others, including Mr. A. H. Stuart, Secretary of the Interior (the department to which the subject primarily belonged), was of the opinion that it did, and certified the lands above as though that were the true construction of the grant.

The agents of the State, who had been appointed by the governor to select the sections designated by odd numbers, selected them from the mouth of the river towards the northern boundary of the State as far as surveyed; in other words, above the fork as well as below.

On the 15th of May, 1856, Congress, by act of that date,* granted to the State of Iowa, for the purpose of aiding in the construction of certain railroads specified (including the Dubuque and Pacific Railroad), every alternate section of land for six sections in width on each side of said roads. Standing without any restriction, this grant, as the road named was laid out, would have embraced certain tracts which, if the act of the 8th of August, 1846, rightly construed *did* include tracts *above* the fork, had been granted under that act for the improvement of the navigation of the Des Moines River. But the grant did not stand without restriction. On the contrary, it contained a reservation, thus :

"*Provided*, that any and all lands heretofore reserved to the United States by any act of Congress, *or in any other manner by competent authority*, for the purpose of aiding in any object of internal improvement, or for any other purpose whatsoever, be, and the same are hereby, reserved to the United States from the operation of this act, except so far as it may be found necessary to locate the routes of said railroads through such reserved lands, in which case the right of way only shall be granted, subject to the approval of the President of the United States."

If, therefore, Mr. Stuart and the Department of the Interior, and the officers of the Federal government, who had acted on the idea that the grant included lands above the fork, and reserved them to the United States for the purpose of aiding the improvement of the Des Moines River, were " competent authority," within the meaning of this act, then to whomsoever else they passed or did not pass, those lands did *not* pass to the State under this act of May 15th, 1856, for the benefit of its railroads. But herein, again, it is obvious was a field for controversy.

Whatever the reservation or proviso to the act might mean, the State of Iowa, by act of July 14th, 1856, accepted the act and, without describing any lands particularly, enacted that the lands granted by the act " are hereby disposed

---

* 11 Stat. at Large, 9.

of, granted, and conferred to and upon the Dubuque and Pacific Railroad Company." After this the lands were treated by the railway company as belonging to it, and on the 7th of April, 1863, the Commissioner of the General Land Office and Secretary of the Interior approved these specific lands to the railroad grant, and they were certified to the State on that day, as part of the railway grant. The railway company now paid the taxes.

Here then the two companies—the navigation company on the one hand and the railroad company on the other were put in antagonism. A question to be decided was this, "Did the grant of the 8th August, 1846, which was now represented by the navigation company, pass lands *above* the fork ?"

[To preserve, however, in a chronological order, the chain of certain event hereinafter referred to, we will here, at the apparent expense of unity of subject, mention that on the 22d of March, 1858, the legislature of Iowa, having sold a portion of the lands granted by the act of August 8th, 1846, and being about to convey certain other portions to the Des Moines Navigation Company, granted, by an act, all the residue of them, and "all lands and compensation which may be given in extension, *or in lieu of any portion thereof, by the General Government,* to the Keokuk, Fort Des Moines, and Minnesota Railroad Company (whose name was subsequently changed to the Des Moines Valley Railroad Company);" the grant to become operative so soon as Congress shall assent to or permit a diversion, or the title thereto shall become vested in the State so as to be subject to a grant.*]

To come back, however, now, to the question about the extent of the grant.

That question got before this court A. D. 1860, in *The Dubuque and Pacific Railroad* v. *Litchfield,*† where it was finally decided that the grant carried nothing above the fork. This question, therefore, was at an end. But it did not follow

---

* This assent was given by the act of Congress of July 12th, 1862. See *infra,* p. 158.

† 23 Howard, 66.

from this that any of the lands above had passed to the railroad company under the act of the 15th May, 1856. That was another question, and whether or not they had so passed would depend on the effect of the proviso or reservation in that act; a matter then as yet judicially unsettled.

As soon as the decision in *The Dubuque and Pacific Railroad* v. *Litchfield*, deciding that the navigation company, under the grant of the 8th of August, 1846, took no lands *above* the fork, was announced (which it was in 1860), Congress passed first a joint resolution,* and then an act,† to counteract its effects.

The joint resolution, which bore date March 2d, 1861, was thus:

"*Resolved*, &c., That all the title which the United States still retain in the tracts of land along the Des Moines River and above the mouth of the Raccoon Fork thereof, which have been certified to said State improperly by the Department of the Interior as part of the grant by act of Congress, approved August 8th, 1846, and which is now held by *bonâ fide* purchasers under the State of Iowa, be, and the same is hereby relinquished to the State of Iowa."

The act of Congress, which was approved 12th of July, 1862, was thus:

" *Be it enacted*, That the grant of lands to the then Territory of Iowa for the improvement of the Des Moines River, made by the act of August 8th, 1846, is hereby extended so as to include the alternate sections (designated by odd numbers) lying within five miles of said river, between the Raccoon Fork and the northern boundary of said State. Such lands are to be held and applied in accordance with the provisions of the original grant, except that the consent of Congress is hereby given to the application of a portion thereof to aid in the construction of the Keokuk, Fort Des Moines, and Minnesota Railroad [subsequently called the Des Moines Valley Road], in accordance with the provisions of the act of the General Assembly of the State of Iowa, approved March 22d, 1858."‡

---

* 12 Stat. at Large, 251.  † Ib. 543.

‡ See mention of this act, *supra*, p. 157.

The act then went on further to say:

"And if any of said lands shall have been sold or otherwise disposed of by the *United States*, before the passage of this act, excepting those released by the United States to the grantees of the State of Iowa under the joint resolution of March 2d, 1861, the Secretary of the Interior is hereby directed to set apart an equal amount of lands within said State, to be certified in lieu thereof. Provided that if the said *State* shall have sold and conveyed any portion of the lands lying within the limits of this grant, *the title of which has proved invalid,* any lands which shall be certified to said State, in lieu thereof, by virtue of the provisions of this act, shall inure to and *be held as a trust fund* for the benefit of the person or persons respectively, whose title shall have failed as aforesaid."

This act having been passed, an agent of the State of Iowa and the Commissioner of the General Land Office met, and on an assumption that the lands above the fork *meant* to be given by the act of Congress, July 12th, 1862, for the improvement of the Des Moines River, had been granted to the Dubuque and Pacific Railroad Company by the act of May 15th, 1856, agreed "that the United States had sold and otherwise disposed of a certain quantity of land prior to the passage of the said act [of July 12th, 1862], for which the State was entitled to indemnity under the act aforesaid;" and, entering into negotiations, finally made an adjustment of things by which a large quantity of lands were certified to the State as indemnity for the lands which, upon the representations of the agent of Iowa, the United States admitted had been disposed of by it under the grant of May 15th, 1856, for railroad purposes. And this action of the commissioner, made May 21st, 1866, was approved by the Secretary of the Interior on the next day.

Soon after this adjustment, that is to say, in the spring of 1867, this court, in the case of *Wolcott* v. *Des Moines Company*,[*] decided that the lands which had been reserved by the action of so many principal officers of the United States,

---

[*] 5 Wallace, 681.

including Mr. Stuart, Secretary of the Interior, had been reserved by "competent authority," within the meaning of the proviso in the act of May 15th, 1856, and decided again the same thing in *Des Moines Navigation Company* v. *Burr*,[*] and yet again in *Harriet Riley* v. *W. B. Wells*, a case which the reporter did not, in view of two previous decisions, think it necessary to report.

As under each one of these decisions the court decided that the United States had not, by its act of the 15th of May, 1856, given anything away to the State for the benefit of its railroads which, even assuming that the act of the 8th of August, 1846, carried lands *above* the fork, would have belonged to the navigation company—or, as, in other words, it decided that there was, so far as the act of May 15th, 1856, was concerned, no ground for indemnity to the State of Iowa for a loss to the navigation company, the State was now naturally prompt to ratify the action of its own agent and of the Federal officers, who had acted on a different supposition of the effect of the proviso or reservation; and on the 31st of March, 1868, the State, accordingly, by act of legislature, did ratify and confirm their action.

Congress equally, on the 3d of March, 1871, notwithstanding the decisions above mentioned, by act of the date just mentioned[†] enacted:

"That the title to the land certified to the State of Iowa by the Commissioner of the General Land Office, under the act of July 12th, 1862, in accordance with the adjustment made by the authorized agent of the State of Iowa and the Commissioner of the General Land Office, May 21st, 1866, and approved by the Secretary of the Interior May 22d, 1866, and which adjustment was ratified and confirmed by the State of Iowa March 31st, 1868, be, and the same is ratified and confirmed to the State of Iowa and *its grantees*, in accordance with said adjustment and said act of the General Assembly of the State of Iowa."

Thus, as the reader will perceive, the summing up of everything, including all the legislation, and all the decisions, ended with these results:

---

[*] 5 Wallace, 681.    [†] 16 Stat. at Large, 582.

The navigation company got its alternate sections *above* the fork:

The Des Moines Valley Railroad (succeeding to the Keokuk, Fort Des Moines, and Minnesota Railroad) got the body of the "indemnity lands," which had been granted to the State for the improvement of the river, on the assumption that the navigation company (owing to the Congressional grant of May 15th, 1856) had *not got* them:

While the Dubuque and Pacific Railroad Company, for whose *erroneously supposed* taking away, under the grant just mentioned, from the navigation company of lands above the fork, the indemnity lands had been granted to the said navigation company, got—nothing at all.

The Homestead Company (to which it ought to have been earlier said that the Dubuque and Pacific Railroad Company had granted its rights, and who, with it, had paid $80,000 taxes on the lands) now accordingly filed its bill in the court below, against the navigation company, the Valley Railroad Company, and others, setting up—

1st. (And in the face of what was decided in *Wolcott* v. *Des Moines Company* and the two other cases) that the act of May 15th, 1856, did carry to it the lands above the fork.

2d. That if this was not so, then that they were holders of titles under the State, which had failed within the meaning of the proviso in the act of July 12th, 1862, and so *cestui que trusts* for a portion of the indemnity lands granted by it.

3d. That if they were not such holders, and ... entitled, they were nevertheless entitled to a portion of those lands, because the said lands had been certified to the navigation company or its grantees upon the assumption that the river lands had been granted by the act of May 15th, 1856, to the railroad company; a matter now decided not to have been true in fact or law.

The court below dismissed the bill and the Homestead Company took this appeal.

*Mr. James Grant, for the appellants; Messrs. J. F. Withrow, C. C. Nourse, and E. C. Litchfield, contra.*

Mr. Justice DAVIS delivered the opinion of the court.

This case presents another phase of the Des Moines River land litigation.

The main question involved in this case is the question of title to the Des Moines River lands, which was settled several years ago by the decision in the cases of *Wolcott and Burr*,\* and in the subsequent and unreported case of *Riley* v. *Wells*, adversely to the title set up by the appellants. At the present term of this court, the principles involved in these decisions have been reconsidered and reaffirmed.† It is therefore no longer an open question that neither the State of Iowa nor the railroad companies, for whose benefit the grant of 1856 was made, took any title by that act to the lands then claimed to belong to the Des Moines River grant of 1846, and that the joint resolution of 2d of March, 1861, and act of 12th of July, 1862, transferred the title from the United States and vested it in the State of Iowa for the use of its grantees under the river grant. If so, the claim of title by the appellants, who are grantees under one of these railroad companies, to the lands certified to the State of Iowa, under the act of August 8th, 1846, above the Raccoon Fork of the Des Moines River, has no foundation to rest upon.

But the appellants insist if they cannot recover these lands they are *cestui que trusts* for a portion of the indemnity lands obtained by the State under the act of July 12th, 1862. Congress by this act extended the grant originally made to the State in 1846, for the improvement of the Des Moines River, so as to include the alternate sections of land (designated by odd numbers) between the Raccoon Fork and the northern boundary of the State, and consented that a portion of these lands should be applied to the construction of a railroad, which, by change of name, is called the Des Moines Valley Road.

This legislation was intended to put the State in exactly the position it would have been, if there had been no dis-

---

\* 5 Wallace, 681.      † Williams *v.* Baker, *supra*, p. 144.

pute as to the extent of the grant in 1846, and accordingly the Secretary of the Interior was directed if any of the lands within the granted limits should have been sold or otherwise disposed of by the United States before the passage of the act, to set apart an equal quantity elsewhere in the State in lieu thereof.

In case the State also had sold and conveyed any of these lands, the title to which had proved invalid, the act directed that the land set apart by the Secretary of the Interior should be held in trust for the benefit of those persons whose titles had thus failed. This latter provision was rendered necessary by the conflict in opinion which had for a series of years existed concerning this river grant. The State had always maintained that the original grant, properly construed, extended above the Raccoon Fork, while on the contrary, the United States had at different times both denied and admitted the claim of the State. It was to be expected in this condition of the dispute that both the State and General Government had disposed of a portion of these lands. If so, and the title of the grantees of the State had proved invalid, it was eminently proper that they should be protected, and there was no better way to do this than to require the State, in the first instance, to use the indemnity lands for this purpose.

It is admitted in the record that the State has conveyed to the Des Moines Valley Railroad Company, one of the defendants in this suit, for good and valuable considerations performed by the company, all the lands received by the State under the act in question, except those only which had been conveyed by the State under the act of August 8th, 1846, and the legislation pursuant thereto.

The inquiry arises, whether the State, at the time of the passage of the act of 12th of July, 1862, had conveyed to the grantor of the appellants any portion of the lands lying within the river grant. If not, they are not within the purview of the act, for they have not suffered any loss by reason of any transaction with the State, and are, therefore, not in a position to claim compensation. The Iowa legislature, by

the act of July 14th, 1856, conveyed to the Dubuque and Pacific Railroad Company, the grantor of the appellants, the lands granted to the State by the act of Congress of May 15th, 1856. The conveyance did not specify any particular lands, but in a general way transferred to the company all the rights and interests which the State received from the United States under this grant. If, therefore, the river lands were not granted to the State by the act in question, they were not embraced in the conveyance which the State made to the company, and the State, therefore, has not broken its engagement with the company. This court having decided and reaffirmed the decision that the grant of 1856 did not include the lands claimed by the State to belong to the river improvement, it is difficult to see on what grounds the appellants can rest their right to indemnity under the act of July 12th, 1862, for they cannot be *cestui que trusts*, as they never had any title which has proved invalid.

But the appellants insist if they are not the holder of any titles which have failed within the meaning of the act of July 12th, 1862, they are, nevertheless, entitled to a portion of the indemnity lands certified to the State under that act, because they were certified upon the assumption that the river lands had been granted by the act of May 15th, 1856. It is undoubtedly true that in 1866, on this theory, the State of Iowa, through its authorized agent, made an adjustment with the Commissioner of the General Land Office, by which a large quantity of lands were certified to the State, as indemnity for the lands which it was claimed had been disposed of by the United States by the grant for railroad purposes in 1856. It is equally true that the construction by these officers of the different acts of Congress relating to this subject, by which this result was obtained, was erroneous, as we have held in three different cases. But the decision in Wolcott's case, the first of the three, was not then announced, and the adjustment was doubtless induced by the decision in Litchfield's case, that the river grant did not extend above the Raccoon Fork. Whatever may have caused

the adjustment, it is quite apparent, as the lands were erroneously certified under the act of July, 1862, that something more was needed than the action of the land commissioner, fortified as it was by the approval of the Secretary of the Interior, to pass a valid title to the State and its grantees. That which was requisite to accomplish this object was obtained by the legislation of the State and of Congress. The legislature of Iowa, in March, 1868, on the performance of certain conditions, directed a conveyance to be made to the Des Moines Valley Railroad for all the lands embraced in the act of Congress, approved the 12th of July, 1862, and ratified the adjustment made with the Commissioner of the General Land Office. In accordance with this legislation the lands in controversy were patented by the State to the company, the conditions imposed upon the company before· this could be done having been complied with. Although the ratification of the adjustment and the grant to the Valley Railroad would seem to be inconsistent acts, yet Congress, with full knowledge on the subject, on the 3d of March, 1871, confirmed the title to the State and its grantees. It is true the law by which this is done, says it is in accordance with the adjustment, and the act of the General Assembly of Iowa, but, as we have seen, this act not only ratified the adjustment, but also granted the lands to the Valley Road.

Indeed, the main purpose of the act was to secure the construction of the road, by the transfer to it of the lands obtained under the adjustment. Whether the State of Iowa in the disposition which it made of these lands, conformed to the adjustment, is not a question for us to consider.

This consideration was properly addressed to Congress, who, with full knowledge that the legislature had parted with the lands to the Valley Road, chose to confirm the title to " the State and its grantees."

If Congress had withheld its consent to what the State had done, neither the State nor the road would have taken anything by the action of the officers certifying the lands.

This was also known to Congress, because the decision in Wolcott's case was then before the country.

Congress, therefore, with full information that the State of Iowa was not entitled to these indemnity lands by reason of any previous legislation, thought proper, nevertheless, to give them to the State, knowing at the time that they were to be used in building a railroad along the line of the Des Moines River. It had already consented that a part of the lands originally designed for the improvement of this river by locks and dams, should be applied to the construction of this road, and was doubtless induced to give the direction it did to the indemnity lands, because it was satisfied that further aid was necessary to secure the completion of the Valley Road, while the east and west roads were either completed or nearly so. If we are correct in these views there. is an end of this controversy, because Congress had the undoubted right to dispose of these lands for such purposes as in its judgment might best subserve the public interests, and having decided this question for itself, the Homestead Company is not in a position to question the authority of that decision. As the grant in 1856 did not cover the river lands in place, this corporation is not within the terms of the act of July 12th, 1862, and have, therefore, no rights which either the State or Congress were bound to respect.

It must be conceded that its expectation to share in the result of the adjustment concluded between the authorized agent of the State and the land department of the General Government was reasonable under the circumstances; but this expectation was not founded on any legal right, and cannot, therefore, be the subject of judicial inquiry.

It seems that the appellants, during this litigation, paid the taxes on a portion of these lands, and claim to be reimbursed for this expenditure in case the title is adjudged to be in the defendants, on the ground that they paid the taxes in good faith and in ignorance of the law. But ignorance of the law is no ground for recovery, and the element of good faith will not sustain an action where the payment has been voluntary, without any request from the true owners of the

land, and with a full knowledge of all the facts. It is an elementary proposition, which does not require support from adjudged cases, that one person cannot make another his debtor by paying the debt of the latter without his request or assent.

It is true, in accordance with our decision, the taxes on these lands were the debt of the defendants, which they should have paid, but their refusal or neglect to do this did not authorize a contestant of their title to make them its debtor by stepping in and paying the taxes for them, without being requested so to do. Nor can a request be implied in the relation which the parties sustained to each other. There is nothing to take the case out of the well-established rule as to voluntary payments. If the appellants, owing to their too great confidence in their title, have risked too much, it is their misfortune, but they are not on that account entitled to have the taxes voluntarily paid by them refunded by the successful party in this suit.

DECREE AFFIRMED.

Mr. Justice MILLER took no part in this decision.

---

NOTE.

At the same time with the preceding was adjudged another, *Crilley* v. *Burrows*, which the court said (Mr. Justice DAVIS delivering the opinion) was "in no essential respect different from it;" and had "no principle which had not already been passed upon by this court in some one of the suits relating to this protracted litigation." On this account it is no further reported.