UNITED STATES v. GRAND RAPIDS & I. R. CO. et al.

(Circuit Court, W. D. Michigan, S. D.   May 25, 1907.)

1. PUBLIC LANDS—RAILROAD GRANT—EFFECT—TIME.

Act June 3, 1856, c. 44, 11 Stat. 21, granting to the state of Michigan in aid of the construction of railroads certain public lands, excepting lands previously reserved, was a grant in praesenti and confined to lands belonging to the government at the date of the grant.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 41, Public Lands, § 227.]

2. SAME—NATURE OF LANDS.

The words "public lands" include only such lands as are subject to sale or other disposition under the general land laws, and not lands reserved from sale by competent authority.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 41, Public Lands, §§ 5, 237.]

3. SAME—WITHDRAWAL FROM SALE.

Where public lands were withdrawn from sale for the subsequent benefit of certain Indians, the fact that the withdrawal was conditional on the land being required for purposes of the Indian treaties, and that the Indians were to have no rights in such lands until after legislation should invest them with the legal title, did not destroy the effectiveness of the withdrawal.

4. SAME—DECISION OF LAND DEPARTMENT—CONCLUSIVENESS.

The construction put on a railroad grant by the Land Department as excepting certain lands for Indian purposes cannot prevail against a correct legal interpretation to the contrary.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 41, Public Lands, § 301.]

5. SAME—RAILROAD GRANT—LANDS INCLUDED.

At the date of the grant of public lands to a state for railroad purposes, the lands in controversy had been reserved from sale conditionally for the benefit of certain Indians, but when the line of the beneficiary railway company was definitely located, and the lands were certified, the lands in controversy had been released from reservation, and were public lands, subject to sale or other disposition by Congress. Held, that as the grant operated from its date, and not from the date of the definite location of the railroad line, the reserved land did not pass under the grant.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 41, Public Lands, §§ 5, 237.]

6. SAME—VACATION OF PATENT—RECOVERY OF PRICE.

Certain public lands having been conditionally reserved for Indians at the date of a railroad grant, and which did not pass thereunder, were nevertheless, in accordance with the then existing construction of such grants by the government land department, certified as a part of the grant; the lands having been withdrawn from the reservation at the time the railroad's line was definitely located. Both parties assumed that the lands were properly covered by the grant for several years, during which time the railroad company paid taxes thereon in excess of the government price, and sold the lands to innocent purchasers for value. After filing the railroad's map of definite location, the United States disposed of more than 23,000 acres of lands which were available to the railroad company under its grant in lieu of the land in question, and the railroad failed to obtain its full quota of land because of a deficiency existing on a part of its line to the extent of five times the amount of the value of the land alleged to have been wrongfully certified. The United States has made no other disposition of the lands, and the rights of no others have intervened. Held, that the United States was not entitled in equity either to a cancel-

lation of the patents for such land, nor to recover from the railroad company the minimum government price of $1.25 per acre therefor.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 41, Public Lands, § 332.

Bona fide purchasers, see note to United States v. Detroit Timber & Lumber Co., 67 C. C. A. 13.]

In Equity.

George G. Covell, U. S. Dist. Atty., and Wm. K. Clute, Asst. U. S. Dist. Atty.

James H. Campbell and Roger Irving Wykes, for defendant railroad company.

KNAPPEN, District Judge. The bill in this cause was filed February 20, 1896, by the Attorney General of the United States under the act of March 3, 1887, providing for the adjustment of land grants made by Congress to aid in the construction of railroads and for the forfeiture of unearned lands (Act May 3, 1887, c. 376, 24 Stat. 556), for the cancellation of patents for 20,276.66 acres of land in the counties of Charlevoix and Emmet, Mich., certified by the United States to the state of Michigan and conveyed thereunder to the Grand Rapids & Indiana Railroad Company, and for the recovery of the minimum government price of $1.25 per acre for such of the lands as shall be found to have been conveyed by the railroad company to innocent purchasers. The facts are these:

In April, 1855, the Ottawa Indians, living in and about Little Traverse Bay, Mich., were negotiating a treaty with the United States, by which the former were seeking to obtain some government lands in Emmet and Charlevoix counties in exchange for lands west of the Mississippi river which had been set apart for these Indians under a former treaty. The Commissioner of Indian Affairs, through the Commissioner of the General Land Office and the Secretary of the Interior, requested the President that certain designated townships and fractional townships be withheld from sale "until it shall be determined whether the same may be required for said Indians." The order of withdrawal was made May 14, 1855, in terms, "with the express understanding that no peculiar or exclusive claim to any of the lands so withdrawn can be acquired by said Indians, for whose future benefit it is understood to. be made, until after they shall, by future legislation, be invested with the legal title thereto." The Land Commissioner accordingly notified the register and receiver of the local land office of, the President's order, and under the commissioner's direction the lands covered by the order of withdrawal were marked by the register on his tract book "Lands withdrawn from sale and withheld for Indian purposes, conditionally, by order of the President of May 14—55."

The lands here involved are but a small part of the lands so conditionally withdrawn. The contemplated treaty (which embraced certain tribes of Chippewas, as well as Ottawas) was concluded, and signed at Detroit by the commissioners of the United States and by the chiefs and head men of the Indians, on July 31, 1855. It provided, among other things, for the withdrawal from sale for the benefit of

the Indians of certain specified lands, and dissolved the tribal organization of the Ottawa and Chippewa Indians, except so far as might be necessary for carrying into effect the new treaty. The lands involved here were excluded from the treaty, and have never been used or disposed of by the United States, except as they were later conveyed to the Grand Rapids & Indiana Railroad Company under the railroad aid grant later referred to. The Land Commissioner, upon the signing of the treaty, at once, and on August 1, 1855, from Detroit, notified the Acting Land Commissioner at Washington of the conclusion of the treaty, giving in detail the descriptions of land embraced in it, and instructed that withdrawal be had of all the lands so described in the treaty, for the purpose of enabling the Indians "to select the quantity of lands guarantied to them by said treaty," and that proper proclamation be made and notice to the Land Office be given "to avoid difficulties that might occur by entries being made within the said boundaries." This treaty was ratified by the Senate (with certain amendments) on April 15, 1856 (11 Stat. [2d Sess. 34th Cong.] p. 626).

On June 3, 1856, after the conclusion and ratification of the treaty, and the permanent exclusion from its operation of the lands here in controversy, but before the Senate amendments had been assented to by the Indians, the United States granted to the state of Michigan, in aid of the construction of certain railroads in that state, including a railroad "from Grand Rapids to some point on or near Traverse Bay," upon the then usual conditions for conveyance from time to time as the building of the road progressed, and for government use of the railroad, every odd-numbered section for six miles on each side of the proposed line of railroad, with fifteen-mile indemnity limits in lieu of such lands within the six-mile limits as should be sold or pre-empted before the railroad lines should be definitely fixed. The state of Michigan accepted the grant February 14, 1857, and designated the Grand Rapids & Indiana Railroad Company as the beneficiary. Meanwhile, in July, 1856, the Indians ratified the amendments made by the Senate to the treaty, and the latter, as so amended, was, on September 10, 1856, duly proclaimed by the President. 11 Stat. [2d Sess. 34th Cong.] p. 629. On February 28, 1857, the railroad grant was formally accepted by the railroad company in writing. The acceptance by both the state and the railroad company was thus after the final ratification of the amended treaty, by the making of which treaty the condition upon which the lands here in question were reserved had failed.

The railroad map of definite location was filed with the Secretary of State for Michigan on November 23, 1857, and with the United States Land Comissioner on July 11, 1858. June 7, 1864, Congress amended the grant of June 3, 1856. by including within the terms of the grant the line from the southern boundary of Michigan to Grand Rapids; the indemnity limits being extended from 15 miles, as in the act of 1856, to 20 miles. Act June 3, 1864, 13 Stat. [1st Sess. 38th Cong.] 119, c. 110. This extension of the indemnity limits was evidently made by reason of the fact that comparatively little public land remained within either the six or twenty mile limits south of Grand

Rapids. This extension amendment was accepted by the state March 10, 1865 (Laws Mich. 1865, p. 241, No. 131), and by the railroad company February 22, 1866. The map of the extended line was filed with the state authorities May 10, 1866, and with the Commissioner of the General Land Office May 25, 1866.

The railroad company fully performed the terms of its agreement under the grant, including the building of the railroad, which was finished by November 25, 1873, and within the time provided by the original congressional and state acts and the subsequent extension acts; and the lands in controversy were accordingly, during the years 1871 to 1874, certified (with other lands) to the state by the Commissioner of the General Land Office, with the approval of the Secretary of the Interior, and upon the certificate of the register and receiver of the government land office to the applicability of the lands to the grant and their freedom from adverse claims.

The order of May 14, 1855, conditionally withdrawing the lands in question from sale, was never in express terms revoked; but, from the time of the making of the Indian treaty until 1887 (several years after the last of the lands had been patented to the railroad company), the making of the treaty was by numerous acts of the President and land officers impliedly and practically construed to be a revocation and termination of the withdrawal, as to lands not embraced therein, and the railroad grant was accordingly construed and recognized as including all lands within its general terms which were not in fact expressly required by the terms and for the purposes of the treaty as actually made. In 1874, after a portion of the lands in question had been certified, the question of the right of the railroad company to the lands in controversy was distinctly raised, and after careful consideration the commissioner of the General Land Office made the express holding, approved by the Secretary of the Interior, that the treaty in question extinguished the Indian claim, and restored to public domain the lands conditionally withdrawn by the order of May 14, 1855, so as to bring them within the grant of June 3, 1856, and, under the then existing view that the status of the land at date of definite location governed, the lands were accordingly certified to the state and patented to the railroad company. In 1887 the right of the railroad company to these lands was denied through a decision of the Secretary of the Interior, in the case of the Jackson, Lansing & Saginaw Railway Company, whose rights were similarly affected by the withdrawal of May 14, 1855, and the grant of June 3, 1856.

The total of the lands actually received by the Grand Rapids & Indiana Railroad Company, under both grants, lacked 101,852.73 acres of the amount contained within the 6-mile limits of the grant; this failure resulting from the fact that the amount within the 20-mile limits north of Grand Rapids available for the purpose was not sufficient to make up the deficit in the southern portion. There is included in the amount stated more than 23,000 acres disposed of by the United States since the extension amendment of 1864, by way of preemptions, sales, and homestead entries, otherwise available to the railroad company under its grants. The railroad company presented a claim to the Interior and Treasury Departments for reimbursement

on account of these failures in its land grant, which claim was disallowed. The proofs show that the railroad company received the lands in controversy in good faith, under its grant, and that it has sold all of said lands to innocent purchasers for value.

1. The title of the granting act in question is "An act making a grant of alternate sections of the public lands to the state of Michigan," etc. The granting words are:

"That there be and hereby is granted to the state of Michigan, to aid in the construction of railroads, * * * every alternate section of land designated by odd numbers for six sections in width on each side of said roads." Act June 3, 1856, c. 44, 11 Stat. 21.

The act expressly excepts "any and all lands heretofore reserved to the United States by any act of Congress, or in any other manner, by competent authority, for the purpose of aiding in any object of internal improvement, or for any other purpose whatsoever." It is now well settled that the grant in question was one in præsenti; that it was confined to public lands; and that lands not public at the date of the grant, viz., June 3, 1856, did not pass under it, even though they later, and before the date of definite location, became public lands. St. Paul & Pacific R. R. Co. v. Northern Pacific R. R. Co., 139 U. S. 1, 11 Sup. Ct. 389, 35 L. Ed. 77; Bardon v. Northern Pacific R. R. Co., 145 U. S. 535, 12 Sup. Ct. 856, 36 L. Ed. 806; United States v. Southern Pacific R. R. Co., 146 U. S. 570, 13 Sup. Ct. 152, 36 L. Ed. 1091; Northern Lumber Co. v. O'Brien, 139 Fed. 614, 71 C. C. A. 598; Id., 27 Sup. Ct. 249, 204 U. S. 190, 51 L. Ed. 438.

The Indian treaty contained the clause:

"This agreement shall be obligatory and binding on the contracting parties as soon as the same shall be ratified by the President and Senate of the United States." 11 Stat. (2d Sess. 34th Cong.) p. 631.

The treaty therefore did not legally take effect until proclaimed by the President, viz., September 10, 1856. Shepard v. Northwestern Life Ins. Co. (C. C.) 40 Fed. 341, 347. The reservation of the lands in question by the President, for the purposes of the contemplated treaty, was by "competent authority," which has not been limited, by the decisions, to cases of actual prior appropriation or Congressional grant, but has been extended to withdrawals in advance of actual grant, and to meet anticipated appropriations. Wilcox v. McConnell, 13 Pet. 498, 10 L. Ed. 264; Grisar v. McDowell, 6 Wall. 363, 381, 18 L. Ed. 863; United States v. Payne (D. C.) 8 Fed. 883, 888; United States v. Leathers, 6 Sawy. 17, Fed. Cas. No. 15,581. The lands reserved were therefore excluded from the subsequent railroad grant, even although it turned out that such reserved lands were not needed for the purpose for which the reservation was made, unless the railroad grant contained a clear declaration of an intent to include them. Wolcott v. Des Moines Co., 5 Wall. 681, 688, 18 L. Ed. 689; Wolsey v. Chapman, 101 U. S. 755, 768, 25 L. Ed. 915; Wisconsin Central R. R. Co. v. Forsythe, 159 U. S. 46, 54, 55, 15 Sup. Ct. 1020, 40 L. Ed. 71; Spencer v. McDougal, 159 U. S. 62, 15 Sup. Ct. 1026, 40 L. Ed. 76; Northern Pacific R. R. Co. v. Musser-Sauntry Co., 168 U. S. 604, 607, 610, 18 Sup. Ct. 205, 42 L. Ed. 596; Northern Lumber

Co. v. O'Brien, 139 Fed. 614, 71 C. C. A. 598; Id., 27 Sup. Ct. 249, 204 U. S. 190, 51 L. Ed. 438.

The reservation clause employed in the grant in question has been attached to all railroad land grants since 1850. The words "public lands" have been held to designate such land as is subject to sale or other disposition under the general laws, but not such as is reserved by competent authority, for any purpose or in any manner, although no exception is made of it. Leavenworth, etc., R. R. Co. v. United States, 92 U. S. 733, 746, 749, 23 L. Ed. 634; Williams v. Baker, 17 Wall. 144, 21 L. Ed. 561; Newhall v. Sanger, 92 U. S. 761, 763, 23 L. Ed. 769; No. Pacific R. R. Co. v. Musser-Sauntry Co., 168 U. S. 609, 18 Sup. Ct. 205, 42 L. Ed. 596; United States v. So. Pacific R. Co., 146 U. S. 570, 13 Sup. Ct. 152, 36 L. Ed. 1091; Northern Lumber Co. v. O'Brien, 139 Fed. 614, 71 C. C. A. 598; Id., 27 Sup. Ct. 249, 204 U. S. 190, 51 L. Ed. 438.

The provision in the granting act for indemnity in lieu of lands sold or pre-empted does not indicate an intention to grant any but public lands. Leavenworth, etc., R. R. Co. v. United States, supra. The fact that the withdrawal was conditional upon the land being required for the purposes of the treaty, and that the Indians were to have no rights in them until after legislation should invest them with the legal title, does not destroy the effectiveness of the withdrawal. Wolcott v. Des Moines Co., supra; Wolsey v. Chapman, supra; Williams v. Baker, 17 Wall. 144, 21 L. Ed. 561; Homestead Co. v. Valley R. R., 17 Wall. 153, 21 L. Ed. 622; Wisconsin Central R. R. v. Forsythe, supra; Spencer v. McDougal, supra; No. Pacific R. R. Co. v. Musser-Sauntry Co., supra.

The construction put upon the grant by the Land Department, as not excepting lands reserved for Indian purposes, cannot legally prevail against a clearly correct legal interpretation. Wilcox v. McConnell, 13 Pet. 511, 10 L. Ed. 264; Wisconsin Central R. R. Co. v. Forsythe, 159 U. S. 46, 61, 15 Sup. Ct. 1020, 40 L. Ed. 71, and cases there cited. If the views above expressed are correct, it results that the lands in question were in contemplation of law reserved from the grant of June 3, 1856, and did not legally pass thereunder.

2. It does not follow, however, that complainant is entitled to relief here. Complainant is in a court of equity, and such court will not "give its aid in the assertion of a mere legal right, contrary to the clear equity and justice of the case." Jones v. New York Guaranty Co., 101 U. S. 628, 25 L. Ed. 1030. The fact that the complainant is the United States does not affect the rule. In order to recover, it must show the same equities as if it were a private party. United States v. Flint, 4 Sawy. 42, 58, Fed. Cas. No. 15,121; United States v. Detroit Lumber Co., 200 U. S. 321, 339, 26 Sup. Ct. 282, 50 L. Ed. 499. The equities of the case are opposed to the recognition of the claim presented. The United States and the defendant railroad company entered into a contract by which the railroad company, in consideration of building the road, was to receive certain lands. It was contemplated that on performing its contract it should receive the full amount granted. Wisconsin Central Railroad Co. v. Forsythe, 159 U. S. 46, 60, 15 Sup. Ct. 1020, 40 L. Ed. 71. The railroad company has

performed its contract in full. Its failure to receive its full quota of lands is to the extent of five times the amount for which payment is now asked. By the undisputed testimony, the railroad company has received the lands in question not only in good faith on its own part, but under a good faith construction put upon the grant by the government's Land Department. By like undisputed proofs, all the lands in question have been sold to, and are held by, good faith purchasers, whose titles are required by law to be confirmed. In no event, therefore, can the patents be canceled; nor could complainant be granted relief beyond a money judgment for the minimum government price of $1.25 per acre. To award such money judgment would not be to "adjust" the grants, for there are no longer any indemnity lands which could be substituted, but would result, through a technicality, in accomplishing an obvious injustice, for although technically, when the grant took effect, viz., at its date, the lands in question were reserved from sale, and thus did not legally pass; yet when the line was definitely located, and, when the lands were certified, they had been released from the reservation, and were public lands, subject to sale and to disposition by Congress. No other disposition has in fact been made of them, and the rights of no others have intervened. Moreover, before the grant was made (June 3, 1856), the Indian treaty had been actually signed (July 31, 1855), the Land Commissioner's order thereon had treated only the lands embraced in the treaty as reserved (August 1, 1855), and the Senate had amended and ratified the treaty (April 15, 1856), and nothing remained for a proper return to the public domain of the lands here in question but the assent by the Indians to the Senate amendments and the proclamation by the President. The government, in certifying the lands, simply carried out the obvious understanding of both parties to the grant, and did what Congress ought equitably to have authorized, and what it is assumed it would have directed had the grant been then construed as excluding the lands formerly conditionally reserved for Indian purposes, but at that time released from such reservation. The construction put by both parties upon the grant was in accordance with the general construction of such grants on the part of the government for some years before and until some years after the certifying of the lands, viz.: That the status at the time of the filing of the map of definite location, rather than at the date of the grant, governed. Meanwhile, acting upon the construction put by the government upon the grant, the railroad company has for many years paid taxes upon the lands in question, in excess of the government price of the lands. More than this, since the filing by the railroad of its map of definite location, the United States has disposed of more than 23,000 acres of such lands, which were properly available to the railroad company under its grant. It may well be that the railroad company has no legal remedy on account of its failure to receive all the lands contemplated, but equity forbids that it should be compelled, under the circumstances here shown, to pay the United States for land to which, as between it and the railroad company, the latter is equitably entitled. The case clearly comes within the decision in United States v. Winona, etc., R. R. Co., 165 U. S. 463, 17 Sup. Ct. 368, 41 L. Ed. 789 (decided since the filing

of the bill in this cause), which case involved similar facts, and was brought under the same statutory authority. The language used by Justice Brewer, in that case, at pages 474 and 475, of 165 U. S., 17 Sup. Ct. 368, 41 L. Ed. 789 is peculiarly applicable to the facts presented here.

It follows that complainant is not entitled to any of the relief prayed.

The bill should be dismissed, and decree entered confirming the titles of the individual purchasers.