# CASES

## ARGUED AND DETERMINED

### IN THE

# United States Circuit and District Courts.

---

UNITED STATES *v.* DES MOINES RIVER NAV. & R. CO. *et al.*

(*Circuit Court, N. D. Iowa, C. D.* June 12, 1890.)

PUBLIC LANDS—GRANTS TO STATE—RIGHTS OF GRANTEES OF STATE.

Where the United States grants lands to a state to aid in improving a navigable river, and the state grants the lands covered by the grant to a corporation on condition that it will carry out such improvements, and afterwards, on the corporation's failure to complete the improvements, by act of legislature, releases it from the contract and confirms the grant, congress will be presumed to have notice of such act; and a subsequent resolution of congress, relinquishing to the state certain land which had been erroneously certified by the secretary of the interior as included in the original grant to the state, will inure to the benefit of the corporation, as the state's grantee.

In Equity.

Bill for cancellation of certain conveyances by the secretary of the interior, the governor of Iowa, and for the quieting of the title of the United States to certain realty in Iowa. Submitted on behalf of the Des Moines River Navigation & Railroad Company on demurrer, and as to the other defendants on the pleadings and proofs.

*John Y. Stone,* Asst. Dist. Atty., *D. C. Chase,* and *W. S. Clark,* for complainant.

*Benton J. Hall* and *Gatch, Connor & Weaver,* for defendants.

SHIRAS, J. In order that the purpose and scope of the bill filed in this cause by the United States may be fairly understood, it becomes necessary to give an outline of the legislation, national and state, affecting what are commonly known as the "Des Moines River Lands," together with the departmental action based thereon, and the construction given thereto in the decisions rendered by the supreme court of the United States in the many cases arising out of the conflicting claims made to the lands in question.

By an act approved August 8, 1846, the congress of the United States "granted to the territory of Iowa, for the purpose of aiding said territory to improve the navigation of the Des Moines river from its mouth to the

'Raccoon Fork,' (so called,) in said territory, one equal moiety, in alternate sections, of the public lands (remaining unsold, and not otherwise disposed of, incumbered, or appropriated) in a strip five miles in width on each side of said river, to be selected within said territory by an agent or agents to be appointed by the governor thereof, subject to the approval of the secretary of the treasury of the United States." The remaining sections of the act provide for the method of disposing of the lands as the work of improvement should progress, declaring the river to be a public highway for the use of the government of the United States free from any toll or other charge upon the property of the United States, and providing that the lands should not be sold for a price lower than the minimum price of other public lands. Immediately after its admission as a state, Iowa, through its general assembly, accepted the grant for the purposes named, and, through commissioners appointed for that purpose, selected the odd-numbered sections as descriptive of the moiety coming to the state, which selection was approved by the secretary of the treasury, and the officers of the local land-office were instructed to reserve the odd-numbered sections from the mouth of the Des Moines to the Raccoon fork thereof, the grant being held to terminate at the latter point. Subsequently, in 1849, the then secretary of the treasury changed the ruling that the grant did not extend above the Raccoon fork, and held that it extended the entire length of the river; and hence the local land-officers were, on the 1st day of June, 1849, instructed to withhold from sale all the land situated in the odd-numbered sections within five miles of the Des Moines river above the Raccoon fork. For the purpose of carrying on the work contemplated in this grant, to-wit, the improvement of the navigation of the Des Moines river, the state of Iowa created a board of public works, under whose control some progress was made in the erection of dams upon the river, and in clearing obstructions out of the channel. In 1851 the board of public works was abolished, and the management of the improvement was intrusted to a commissioner and register. In 1853 a contract was made with Henry O'Reiley by the commissioner and register, for the carrying on by him of the work proposed to be done, which contract was by him released, under date of June 8, 1854, in favor of the Des Moines River Navigation & Railroad Company, a corporation organized on the 6th day of May, 1854, with an authorized capital of $3,000,000; the principal object and business of the corporation being the improvement of the navigation of the Des Moines river by means of dams, locks, and canals, and the construction of railroads connected with, or separate from, the same. On the 9th day of June, 1854, this company and the commissioners in charge of said enterprise, under the laws of the state, entered into a contract whereby the company bound itself "to make and finish the Des Moines river improvement from the Mississippi river to Raccoon fork, on said Des Moines river," the same to be completed on or before the 1st day of July, 1858, and further agreed to pay all the debts then outstanding by reason of the work already done towards the improvement of the navigation of said river, provided the amount thereof should not exceed $60,000, and in consideration thereof

was to be and become entitled to all moneys due and owing to said improvement from all sources; it being further provided:

"That said party of the second part, on their part, hereby covenants and agrees with said party of the first part to sell and convey to the said party of the first part, in manner and upon the terms hereinafter provided, all of the lands donated to the state of Iowa for the improvement of the Des Moines river by act of congress of August 8, 1846, which the said party of the second part had not sold up to the 23d day of December, 1853; for which said lands the said party of the first part covenants and agrees, in manner and form as fixed by this agreement, to pay the sum of thirteen hundred thousand dollars."

The contract further provided the rates to be allowed for the different kinds of work to be done and materials to be furnished in making the proposed improvements, and which, when expended, were to be credited on the sum agreed to be paid for the conveyance of the donated lands. It was also agreed that the navigation company should have the control and management of the improvement, with the right to collect tolls and water-rents for the use thereof for the period of 40 years, at the expiration of which time the works were to revert to the state of Iowa. This contract was based upon the act of the general assembly of the state of Iowa passed January 19, 1853, which authorized the commissioner and register of the Des Moines river improvement to sell the lands in question in such manner as would secure the early completion of the work; it being further provided in said act that the lands should not be sold for a less sum than $1.25 per acre, nor for less than the aggregate sum of $1,300,000, and that any contracts made should be valid only when signed by the commissioner, countersigned by the register, and approved by the governor. It does not appear that the contract of June 9, 1854, had attached thereto the signature of the governor, or that he did, at the time of the execution of the contract, execute any written evidence of his approval thereof.

The navigation company made some progress in the work contracted to be done, but it soon became evident that the company would fall far short of the completion of the work by the time stipulated in the contract. It would seem that the company had become satisfied that in all probability it would be finally held that the grant of 1846 did not extend above the Raccoon fork, and that, unless the lands above that point could be secured to the company, there would be no profit in the enterprise. Mutual charges of bad faith were indulged in between the state and company officials, not necessary to be particularized. Finally, on the 22d of March, 1858, the general assembly of the state, by joint resolution, formulated a proposition for settlement, which on the 15th day of April, 1858, was duly accepted by the company. By the terms of this agreement it was provided that the company should execute to the state full releases of all contracts with and claims against the state, including rights to water-rents, and should surrender to the state the dredge-boat belonging to the improvement, and all material prepared for use in the construction of the improvement in question, and should pay the state the sum of $20,000; and in consideration thereof the state agreed to certify and convey to the company all lands granted by the act of August

·8, 1846, which had been approved and certified to the state by the general government, saving and excepting all such lands as had been sold or agreed ·to be sold and conveyed by the state or its officials prior to the 23d day of December, 1853, and especially excepting 25,487.87 acres lying immediately above the Raccoon fork, supposed to have been sold by the general government, but claimed by the state of Iowa. On May 3, 1858, R. P. Lowe, the governor of the state, executed to the Des Moines River Navigation & Railroad Company 14 deeds or patents describing in detail the lands claimed under the grant, and which include the lands involved in the present suit; and on May 18, 1858, executed a further deed or patent, general in its terms, but using in the granting clause the terms in substance found in the agreement of settlement of March 22, 1858. At the December term, 1859, of the supreme court of the United States, in the case of *Railroad Co.* v. *Litchfield*, 23 How. 66, that court decided that the grant of 1846 extended only to the Raccoon fork, and did not affect the lands above that point. In the year 1856, congress, by an act approved May 15, 1856, granted to the state of Iowa, to aid in the construction of certain named lines of railway from the Mississippi to the Missouri river, every alternate section, designated by odd numbers, for six sections in width on each side of the said roads. One of the proposed lines of railway named in said act was to extend from the city of Dubuque to a point on the Missouri near Sioux City. The Dubuque & Pacific Railroad Company, by grant from the state, became entitled to the lands appropriated by the act of congress to aid in the construction of the line named, and, by virtue of this grant, claimed to be entitled to the odd-numbered sections lying within five miles of either bank of the Des Moines river; the contention being that, as the grant of 1846 did not extend above the Raccoon fork, the lands above that fork were not appropriated, and were therefore covered by the railroad grant. The supreme court decided adversely to this claim of title under the railroad grant, in the case of *Wolcott* v. *Des Moines Co.*, 5 Wall. 681, in which it was in effect held that, although the act of 1846 did not cover the lands above the Raccoon fork, yet the action of the department in charge of the lands in reserving these lands from other use or disposal had the effect of so withdrawing or reserving the same, that the railroad land grant of 1856 did not embrace the same; and that they did not pass to the state under that grant. In the unreported case of *Riley* v. *Welles*, at the December term, 1869, the supreme court held that these lands above the Raccoon fork, though not covered by the act of 1846, were nevertheless so reserved by action of the land department that they were not open to pre-emption entry or other purchase, and hence that Riley's entry gave him no title; and this ruling was reaffirmed in the case of *Crilley* v. *Burrows*, 17 Wall. 167, note.

As already stated, the commissioner of the general land-office, the secretary of the treasury, and the secretary of the interior, and the attorney general had at different times held different views as to the extent of the grant made by the act of 1846; and, when the view prevailed that the grant terminated at the Raccoon fork, the officers of the land-department

had opened the lands above the fork to pre-emption entry, and many persons had entered into actual occupancy of the lands, had improved the same, had paid the requisite price in cash, or by location of military bounty warrants, had obtained the usual certificates as evidence of their supposed rights, and had in many instances procured patents from the United States. Others had purchased lands north of the Raccoon fork, either from the state of Iowa or from the Des Moines River Navigation & Railroad Company, and had actually entered into possession, and commenced the cultivation, of the lands thus conveyed to them.

At the beginning of the year 1861 the situation was as follows: It had been decided that the act of 1846, by its terms, limited the grant of lands therein made in aid of the improvement of the Des Moines river to lands below the Raccoon fork; that the action of the department officials had reserved the lands above the Raccoon fork, so that the land grant in aid of railroads made by congress in May, 1856, did not include them, nor were the same open to entry by settlers under the pre-emption laws of the United States. The rulings thus made defeated the claims of title to the lands above the Raccoon fork made under the Des Moines river improvement grant of 1846, under the railroad aid grant of 1856, and under all pre-emption entries made by actual settlers, and thus established the fact that it was within the power of the congress of the United States to determine the future disposition to be made thereof. On March 2, 1861, congress passed the following "joint resolution to quiet title to lands in the state of Iowa:"

"Resolved by the senate and house of representatives of the United States of America in congress assembled, that all the title which the United States still retain in the tract of land along the Des Moines river, and above the Raccoon fork thereof, in the state of Iowa, which have been heretofore certified to said state improperly by the department of the interior, as part of the grant by act of congress approved August 8th, 1846, and which is now held by *bona fide* purchasers under the state of Iowa, be, and the same is hereby, relinquished to the state of Iowa."

By an act passed July 12, 1862, congress enacted:

"That the grant of lands to the then territory of Iowa for the improvement of the Des Moines river, made by the act of August 8, 1846, is hereby extended so as to include the alternate sections (designated by odd numbers) lying within five miles of said river, between the Raccoon fork and the northern boundary of said state; such lands are to be held and applied in accordance with the provisions of the original grant, except that the consent of congress is hereby given to the application of a portion thereof to aid in the construction of the Keokuk, Fort Des Moines & Minnesota Railroad, in accordance with the provision of the act of the general assembly of the state of Iowa, approved March 22, 1858. And if any of said lands shall have been sold or otherwise disposed of by the United States before the passage of this act, excepting those released by the United States to the grantees of the state of Iowa, under the joint resolution of March 2, 1862, the secretary of the interior is hereby directed to set apart an equal amount of lands within said state to be certified in lieu thereof: provided, that if the said state shall have sold and conveyed any portion of the lands lying within the limits of this grant, the title of which has proved invalid, any lands which shall be certi-

fied to said state in lieu thereof, by virtue of the provisions of this act, shall inure to and be held as a trust fund for the benefit of the person or persons, respectively, whose titles shall have failed as aforesaid."

In *Williams* v. *Baker*, 17 Wall. 144, it was held "that by the joint resolution of 1861, and the act of 1862, the state of Iowa did receive the title for the use of those to whom she had sold them, as part of that grant, and for such other purposes as had become proper under that grant. In *Homestead Co.* v. *Valley Railroad Co.*, 17 Wall. 153, it is said:

"It is therefore no longer an open question that neither the state of Iowa, nor the railroad companies for whose benefit the grant of 1856 was made, took any title by that act to the lands then claimed to belong to the Des Moines river grant of 1846, and that the joint resolution of 2d of March, 1861, and act of 12th of July, 1862, transferred the title from the United States, and vested it in the state of Iowa for the use of its grantees under the river grant."

In *Bullard* v. *Railroad Co.*, 122 U. S. 167, 7 Sup. Ct. Rep. 1149, it was held that the order reserving the lands above the Raccoon fork from market, issued April 6, 1850, had been continued in force until the passage of the act of congress of July 12, 1862, and the effect thereof was to defeat a title based upon a pre-emption entry permitted by the land-officers in May, 1862.

Practically, the cases cited, and others dealing with the same general questions, had resulted in holding that the settlers who had made pre-emption entries upon the lands north of the Raccoon fork, even though they had procured patents from the United States, did not thereby procure any title to the lands occupied by them, and hence had no standing enabling them to question the validity of the titles asserted against them, and derived from the act of congress of July 12, 1862, and the joint resolution of 1861. Many of these settlers had given up the contest, and had either abandoned the lands, or had purchased from the parties holding title under the navigation company. Proceedings having been instituted against the settlers still in possession, looking to their eviction, the recognition of the hardships necessarily resulting therefrom led to the bringing the present bill on behalf of the United States; the theory being that if grounds existed which would enable the United States to successfully assert its title to the lands in question, and to obtain a decree quieting the title in the United States, that it would then be placed within the power of congress to protect the settlers in possession by granting them the title thus decreed to be in the United States. Before the filing of the bill, the general assembly of the state of Iowa had, by an act passed March 28, 1888, relinquished to the United States all the title, right, or interest held by the state to the lands in controversy. It may be said that the bill proceeds upon two theories, the one being that the lands granted to the state were so granted for a specific purpose, to-wit, to aid in the improvement of the navigation of the Des Moines river, in the carrying out of which the United States had an interest; that the lands passed to the state clothed with a trust, the state receiving them in trust for the purpose named; that all per-

sons taking title under such grant to the state were charged with notice of this trust; that there was a failure on part of the state and of the navigation company to carry on the work of the improving the navigation of the river; that the company abandoned all purpose of doing the work it had contracted to do, and that under these circumstances the settlement made between the state and the navigation company, whereby it was in effect agreed that the company should no longer be required to prosecute the work on the river, and yet should receive the lands remaining unsold, was in violation of the terms and purposes of the trust under which the grant had been made to the state; and that the United States is entitled to repudiate such agreement, and all conveyances based thereon, and recover back the lands so wrongfully attempted to be conveyed to the navigation company, and through it to the other defendants hereto. The second theory of the bill is that the lands passing to the state under the grant in question could only be disposed of by the state for the purpose of the grant, and in the quantities provided for therein; that the contract of June 9, 1854, and the supplementary contracts based thereon, between the state and the navigation company, were and are void on their face because they lacked the approval of the governor; that in the settlement in 1858 the state could not bind or affect the lands above the Raccoon fork, as the state had not title or interest therein; that the settlement resolutions of 1858 are limited only to the lands actually granted and passing under the act of August 8, 1846; that the deeds or patents of May 3, 1858, were without effect, as the governor of the state had no authority to execute the same; that all of the contracts, agreements, deeds, and settlements between the state and the navigation company made prior to the year 1861 were wholly void and nugatory so far as the lands north of the Raccoon fork are concerned; that the subsequent grant in 1862 was made subject to the purposes and limitations contained in the original act of 1846; and that the principle of the inuring of a subsequently acquired title to the benefit of a prior grantee cannot apply. Any purpose to call in question the title of parties in actual possession, holding under the state or the navigation company, is expressly disclaimed in the bill; it being averred that the benefit of a decree in favor of complainant is sought only as to such lands as are now actually occupied by settlers who do not hold title under the state or the navigation company, the same amounting to 109,057 acres. To this bill the navigation company interposes a demurrer; and the other defendants, who are grantees of the company, have answered to the merits; and, issues being joined, evidence on behalf of complainant and the answering defendants has been taken, and the cause has been fully submitted on its merits, having been fully and ably argued by counsel for the respective parties.

It is earnestly contended by counsel for complainant that as this suit is on behalf of the United States, which for the first time has chosen to assert the rights and equities belonging to the government which created the original trust, the decisions heretofore made by the supreme court are not applicable in the new view which must be taken of the questions

when presented on behalf of the United States. While there is foundation for this claim, yet, in its application, it cannot be carried to the extent of wholly ignoring the many decisions of the supreme court giving a construction to the acts of congress affecting these lands. This court is precluded from giving a construction to those acts other or different from that announced by the supreme court. If any modification or new application of these rulings is to be made, it can only be had by the action of the supreme court. So far as the duty of this court is concerned, its duty is to apply the rulings already announced to the facts developed in this record. Up to the passage of the act of congress of July 12, 1862, it would seem clear that the disposition of the lands in question, north of the Raccoon fork, was wholly at the discretion of congress. The validity or invalidity of the contracts and agreements between the state and the navigation company made previous to that date is a question wholly aside from the real issue involved. The state and the navigation company knew that there was grave doubt upon the point of the extent of the grant. They knew that it was for congress to determine whether any recognition should be given by the United States to the contracts between the state and the navigation company, including the agreement of settlement of March 22, 1858. They knew, or were bound to know, that the navigation company could acquire no title to any lands situated above the Raccoon fork unless congress should thereafter make a grant thereof. It was open to the state and the navigation company to agree to a settlement of the difficulties and disputes between them. It was likewise open to the United States to wholly ignore such settlement, and to refuse to make any further grant of lands, in case it was deemed that such settlement was in contravention of the real purposes of the original trust, or was for any reason inimical to the true interests of the general government, or the interests represented by it. When congress passed the act of July 12, 1862, it was a matter of public record that the navigation company did not purpose to further prosecute the work of improving the navigation of the river, and that the state had wholly released the company from any further obligation in that respect, and had also assigned to the company all claims to lands certified under the act of congress of 1846. The act of July 12, 1862, was therefore passed with full knowledge of the actual situation, and it must be construed in that light. Whatever rights were conferred by that act upon the navigation company, as the grantee of the state, were so conferred on account of the work done and expenditures made in the past, and without any expectation that any further expenditures would be made by that company in the future in aid of the improvement of the navigation of the Des Moines river. No matter how clear it might be now made to appear that the work done by the navigation company was of little practical value towards the desired end, the fact remains that the state of Iowa, by the settlement of 1858, released the company from further performance of its contracts, and released to it all claims upon the United States for lands certified to the state in aid of the enterprise; and the congress of the United States, waiving all questions of the amount of the work

done, or its present value, or of the misapplication of the lands granted, or of the proceeds thereof, passed the act of July 12, 1862, extending the grant made by the act of 1846 to the northern boundary of the state. The grant thus made cannot be limited nor modified by arguments deduced from facts existing when the act was passed; for it must be conclusively presumed that all such facts were known to the law-making power when action was taken by it.

The courts are confined to the duty of construing the act, and determining its force and effect; and, the supreme court having held that this act conveyed the title of the United States to the state of Iowa for the use and benefit of its grantees under the river land grant, this court in this case is bound to hold that such is the true construction of the act, regardless of all considerations and arguments based upon the allegations of the inadequacy of the consideration received from the company, of the trifling value of the work done by it, of the misapplication of the property, and the proceeds thereof, thereby practically defeating the purposes of the original grant, and other like allegations. Furthermore, in May, 1858, deeds had been executed in the name of the state of Iowa conveying to the navigation company "all lands granted by the act of congress of August 8th, 1846, to aid in the improvement of the Des Moines river, which have been approved and certified to the state of Iowa by the general government," etc. When the act of July 12, 1862, was passed, the navigation company stood in the position of a grantee from the state as to these lands; and if congress had intended to except the company from among the grantees of the state, who were to be benefited by that act, would not such exception have been expressly named in the act? But this is one of the questions which is not open to discussion in this court, having been determined by the supreme court; and, if it is to be reargued and reconsidered, it can only be done before that tribunal. In view of the rulings made by the court of last resort, I am compelled to hold that by the act of July 12, 1862, the title to the lands in question passed to the state of Iowa, and to its grantees, of which the navigation company was one, and that, in view of the construction placed upon that act by the supreme court, it must be held that the United States cannot now assert title to these lands, nor can the United States be heard to assert that the grant made by the act of July 12, 1862, must be set aside for any of the reasons alleged in the bill.

I have not taken up in detail the grounds urged by counsel for complainant in support of the relief sought in the bill, mainly for the reason that, as I construe the decisions of the supreme court, these questions have been settled by that tribunal, and this court cannot reopen the controversies intended to be set at rest by the many elaborate opinions delivered by the supreme court in the cases that have come before it. If I am in error in this conclusion, it will have no effect upon the final decision of this cause, which it is understood will be promptly carried to the court of last resort, in which tribunal these questions will be fully presented, and where a final and conclusive judgment can be pronounced. As I understand the effect of these decisions, they

compel this court to hold that, notwithstanding all that has been shown in support of the allegations of the bill, the complainant has failed to make out a case entitling it to the relief sought in any of its forms, and consequently the bill must be dismissed. With this announcement of the conclusion reached, the duty of the court in this cause is fulfilled, and it may be wholly out of place to make any suggestions in the premises; and yet, in view of the facts known to the court, and in view of the fact that by the institution of this proceeding the United States has evinced a disposition to try to remedy the injustice and wrong that has been caused to the settlers in actual occupancy of these lands, resulting from the mistaken actions and judgments of the officials of the United States, I cannot refrain, in concluding this opinion, from urging upon the congress of the United States the claim of these settlers for some relief. The question is not as to the legal title to these lands as between the navigation company and its grantees and the settlers, but as to the duty and obligation resting upon the United States to remedy the wrong done to its grantees, and resulting from the acts of its own officials.

The officers of the United States in charge of the public domain in the state of Iowa threw open these lands north of the Raccoon fork to preemption entry. Settlers in good faith made their entries in the proper local land-office, received the usual evidences of entry, entered upon the actual occupancy of the lands, built their homes thereon, and in some instances completed the evidence of their titles, as they supposed, by procuring patents from the government. True, it may be said that they were bound to know that the legal effect of the reservation of these lands by order of the commissioner of the land-office was to reserve the lands from private entry, but probably none of them had ever heard of such order, or knew of its existence; and certainly, when the land-office itself treated the lands as open to entry, permitted entries to be made, and titles to be completed by the issuance of patents, it could not be expected that these frontier settlers should be more astute in that particular, or be better posted in the legal effect of the action had in the land department, than the officers of the government having charge of the business of the land department itself. Through some strange blunder, when congress came to deal with the situation in 1861 and 1862, the interests of the state of Iowa, of the navigation company, and of parties purchasing from or under the state, were carefully guarded; but the rights of actual settlers, claiming under the United States, were left wholly unprovided for. I cannot bring myself to believe that such failure was intentional. None of the parties whose interests were to be considered could present so strong and meritorious a claim to the protection of congress as these settlers in actual occupancy of the lands. It would seem far more probable that when it was provided in the act of 1862, extending the original grant from the Raccoon fork to the northern boundary of the state, that "if any of said lands shall have been sold or otherwise disposed of by the United States before the passage of this act, excepting those released by the United States to the grantees of the state of Iowa, under the

joint resolution of March 2, 1862, the secretary of the interior is hereby directed to set apart an equal amount of lands within said state to be certified in lieu thereof," it was then the belief of congress that all lands entered by actual settlers were in fact disposed of by the United States, within the meaning of this clause of the act; and by providing for the certification of indemnity lands in place thereof such disposition to actual settlers would be left undisturbed. Had this construction been placed upon the act, lands sold or otherwise disposed of by the United States would have been excepted from the grant, and indemnity lands would have been certified to the state in lieu thereof, and thus the rights of all would have been protected. When, however, it was held that the reservation by the department nullified all entries made, and prevented any rights from attaching to the lands in favor of settlers occupying and improving the same, and that such lands were not disposed of by the United States, then the settlers holding under the United States were wholly ignored, and left without protection. As I have already said, I cannot believe that such was the intent of congress; yet such is the result. No one, it seems to me, who understands the facts will question the proposition that it was most clearly the duty of congress, when it undertook to solve the situation before it in 1862, to have protected the rights of the settlers who had entered into possession of these lands, believing them to be open to entry and settlement; the same being done with the assent of the officers of the land department. That duty has never been fulfilled. The reasons for it exist in even stronger force to-day. Through some blunder or misconception, congress, when it had the power, failed to reserve to the settlers the lands occupied by them, but, on the contrary, enacted an act which, it is held, gives the lands in question to the grantees of the state of Iowa. The consequences of the failure of congress to then protect settlers, who were virtually its grantees, are now seen in the proceedings which must result in the eviction of these settlers from the lands and homes they have occupied for 30 years and more.

But one course can be pursued that will meet the present exigency, and that is for the United States to purchase the lands in question from the defendants, and, having thus acquired the title thereto, congress can deal with the settlers upon equitable principles. It is not within the power of the courts, by any possible construction of the existing acts, to meet the difficulties of the situation. Taking into account the equities and claims on behalf of the state, the navigation company, and their grantees, congress, in 1861 and 1862, to meet the same, extended the grant of 1846 from the Raccoon fork to the north boundary of the state, but in so doing failed to protect the settlers then actually occupying portions of the lands thus granted. Should the court, in the effort to protect the settlers, now hold them entitled to their homes, a manifest wrong would be done to the grantees of the navigation company, who for many years have paid the taxes on these lands, and have sold and conveyed the same, in many instances, to parties paying full value therefor. If the courts, disregarding the many decisions heretofore made, should find some ground for holding that the United States might, at

this late day, take a decree adjudging the title to be in the government for the benefit of the settlers, Paul might be thereby paid, but Peter would be robbed. None of the defendants are in possession of the lands, and none of them have built their homes thereon. To them the lands are merely a matter of barter and sale, and doubtless all of them would gladly sell their interest to the government. By a purchase from them the United States would be placed in a position to do justice to the settlers without injuring others. The obligation resting upon the United States is not a matter of sentiment, based solely upon sympathy for the settlers. Many of these have paid the United States for the lands held by them, and hold patents for them, issued under the name and authority of the United States. It now appears that the United States, through the action of congress, has granted away these lands; and the title of the settlers, upon the faith of which they have spent their years and strength in improving their farms, is held to be only waste paper. The United States stands in the position of grantor to the settlers, and, by the action of the government officials, they have been misled on the question of their right to occupy and improve the lands held by them. The wrong thus caused can only be remedied now by the United States securing to them the title to their homes; and this can be done by purchasing, as suggested, the title of the defendants to the 109,057 acres of land described in the bill herein filed, the power to do which resides in congress alone. Upon the questions presented by the bill of complainant, the defendants are entitled to a dismissal of the bill upon the merits, and it is so ordered.