WISCONSIN CENT. R. CO. *v.* FORSYTHE. SAME *v.* LENTY. SAME *v.* BEKKEN.

(*Circuit Court, W. D. Wisconsin.* September 15, 1890.)

PUBLIC LANDS—RESERVATIONS AND DONATIONS.

Congress, by an act approved June 3, 1856, (11 St. 20,) granted to Wisconsin, to aid in the construction of "a railroad from Madison or Columbus, by the way of Portage City, to the St. Croix river or lake, between townships 25 and 31, and from thence to the west end of Lake Superior, and to Bayfield, and also from Fond du Lac, on Lake Winnebago, northerly to the state line, every alternate section of land designated by odd numbers for six sections in width on each side of said roads, respectively," with indemnity limits of 15 miles from each road; the lands unsold to revert to the United States, unless the roads were completed within 10 years. In anticipation of the passage of that act, the commissioner of the land-office, May 29, 1856,

directed the registers and receivers of the districts in which these lands were to suspend sales and locations until further orders. This grant was duly accepted by the state, and the benefit of it conferred upon a railroad company. The map of definite location of the Bayfield branch was filed July 17, 1858, and was approved. After the final location of that branch, the commissioner of the land-office made an order withdrawing and reserving from entry and location all the odd-numbered sections, outside the 6 and within the 15 mile indemnity limits of certain roads, described in the act of 1856, excluding the Bayfield branch. Prior to May 5, 1864, nothing had been done under the act of 1856, except to construct the road from Portage to Tomah, and to definitely locate the Bayfield branch. On that day congress passed another act, granting to the state, "for the purpose of aiding in the construction of a railroad from a point on the St. Croix river or lake, between townships 25 and 31, to the west end of Lake Superior, and from some point on the line of said railroad, to be selected by said state, to Bayfield, every alternate section of public land designated by odd numbers, for ten sections in width on each side of said road, deducting any and all lands that may have been granted to the state of Wisconsin, for the same purpose," by the act of congress of June 3, 1856, "upon the same terms and conditions" as are contained in the latter act, with indemnity limits of 20 miles. The second and third sections granted to the state a like amount of place limits, with like indemnity limits, to aid in the construction of railroads, respectively, from Tomah to the St. Croix river or lake, and from designated places in the eastern part of the state, in a north-westerly direction to Bayfield, and thence to Superior, on Lake Superior. But its sixth section provided: "That any and all lands reserved to the United States by any act of congress for the purpose of aiding in any object of internal improvement, or in any manner, for any purpose whatsoever, and all mineral lands, be, and the same are hereby, reserved and excluded from the operation of this act, except so far as it may be found necessary to locate the route of such railroads through such reserved lands; in which case the right of way only shall be granted, subject to the approval of the president of the United States." 13 St. 66. The road described in the third section of the act of 1864 was constructed by the Wisconsin Central Railroad Company, and that company became entitled to the benefit of the grant made by that section. Its road was definitely located November 10, 1869. The road extending from a point north of St. Croix river or lake to Bayfield belongs to what is called the "Omaha Company." The lines of that road and of the Central road approach each other as they, respectively, approach Lake Superior, so that the place limits of the Central road overlapped the original 15-mile indemnity limits of the Bayfield branch of the Omaha Company. Those two companies entered into an agreement whereby the Central Company was to have patents for all the lands in the overlap lying east of the easterly 10-mile limit of the Bayfield branch of the Omaha Company, and north and east of the westerly 10-mile limit of the Central road, while the Omaha Company was to have all the other lands within the overlap of the grants. The Central Company got patents from the state for all the lands situated on either side of, and coterminous with, said completed portions of its road. These patents covered the lands in dispute, which are outside and east of the enlarged place limits, (10 sections in width on each side of the Bayfield branch,) and within the 15-mile indemnity limits of that road. They are also within the 10-mile place limits of the Central road, as defined by the act of 1864. The Central Company received from the Omaha Company a deed of release covering those lands and others similarly situated. In 1887 the Omaha Company had a final adjustment of its land grant, when Secretary Lamar ruled (6 Dec. Dep. Int. 190) that the lands within the original indemnity limits of the Bayfield branch, as defined in the act of 1856, were, by orders of the secretary, "reserved to the United States" at the date of the passage of the act of 1864, and therefore were not included in the grant by that act. Upon a rehearing of that question before Secretary Noble (10 Dec. Dep. Int. 63) the same ruling was made. After these rulings, the lands here claimed by the Central Company were entered under the homestead and pre-emption laws of the United States, and patented to the defendant. *Held:* (1) The purpose of the act of 1864 was to break the continuity of the original line from Tomah, via St. Croix river or lake, to the west end of Lake Superior and to Bayfield, and to devote to the construction of separate and distinct portions of that line an increased quantity of lands beyond the amount granted by, or which could have been made available under, the act of 1856. (2) The act of 1864 did not wholly displace the act of 1856, and make an entirely new, independent grant as of its date of the place lands to the extent of 10 full sections in width on each side of the particular roads therein mentioned, with indemnity limits of 20 miles, but, in legal effect, granted 4 additional sections in width of place lands, with indemnity limits enlarged from 15 to 20 miles, and confirmed the previous grant of 6 sections in width of place lands, with 15 miles indemnity limits; in other words, as to the Bayfield road, it converted 4 miles of the original indemnity limits, as defined in the act of 1856, into place limits, and added 5 miles on each side of the place limits, thus enlarged, to the indemnity limits, leaving untouched in all other respects the original grant of lands for that road.

(3) Except as to that part of the indemnity lands converted by the first section of the act of 1864 into place lands of the Bayfield road, the orders of the secretary of the interior, made prior to that year, withdrawing from sale and location for the benefit of that road its entire indemnity lands, was not abrogated or annulled by that act, congress not intending to deprive the Bayfield road of any part of the original indemnity lands. (4) The lands within the original indemnity limits of the Bayfield road, embraced in the withdrawals from sale and location by the secretary of the interior, prior to the passage of the act of 1864, were not *granted* by, but were excluded from the operation of, that act, because, within its meaning, and according to the decisions of the supreme court, they had been, and then were, by reason of such withdrawals, "reserved to the United States." (5) Although the object of such withdrawals, namely, to supply deficiencies in the place limits of the Bayfield road, was fully satisfied by the adjustment made with the Omaha Company of the grant for the benefit of that road, the lands so withdrawn, although falling within the outer lines of the place limits of the Central road, did not become the property of the Central Company, because, having been "reserved to the United States" prior to 1864, they were excluded altogether from the operation of that act, and could not be brought under it by reason of their not being finally needed for the Bayfield road. (6) The agreement between the Omaha and Central Companies, and the deed of release from the former to the latter company, was of no avail, as against the United States, because the Omaha Company acquired no legal interest in the lands in dispute which it could transfer to the other company, the lands never having been selected and set apart by the land department for the Bayfield road. Until indemnity lands are so specially selected and set apart, the title and right of property therein remains in the United States

At Law.

*Pinny & Sanborn, W. F. Vilas,* and *George A. Jenks,* for plaintiff.
*Geo. G. Greene* and *A. W. Weisbrod,* for defendant.
Before HARLAN, Justice, and BUNN, J.

HARLAN, Justice. This action of ejectment involves the title to the S. W. ¼ of section 11, township 47 N., of range 4 W., in Ashland county, Wisconsin, which the plaintiff, the Wisconsin Central Railroad Company, claims to own, and of which the defendant, William O. Forsythe, is in possession. The latter asserts title in himself, and denies that the company has any interest in the premises. The plaintiff's claim of ownership rests, primarily, upon the third section of an act of congress, approved May 5, 1864, granting lands to Wisconsin in aid of the construction of railroads in certain parts of that state. 13 St. 66. The defendant, denying that the lands in dispute were included in those so granted, avers that they constituted a part of other lands, which, at the time of the passage of the above act, were reserved to the United States for the purposes of a previous act, approved June 3, 1856, granting lands to aid in the construction of certain railroads in the same state. 11 St. 20. The defense is also based upon certain proceedings and decisions in the interior department, under or in consequence of which the defendant was permitted to enter, and did enter, the lands in dispute, in accordance with the laws of the United States relating to the public domain.

After the evidence was concluded, the jury were directed to return a verdict for the plaintiff, subject to the opinion of the court on a motion for judgment upon the verdict or on a motion for new trial. Such a verdict having been returned, the jury were discharged. The case is now before the court upon a motion by the plaintiff for judgment in its favor, as well as upon a motion by the defendant to set aside the verdict and award a new trial.

The principal question is whether the premises in dispute were part of the lands granted by the third section of the act of 1864 in aid of the construction of the road therein mentioned, which road is now owned and operated by the plaintiff. As the acts of 1856 and 1864 relate to the same general subject, we will be aided in our interpretation of the latter by ascertaining what was done, prior to its passage, in execution of the former.

The act of June 3, 1856, is entitled "An act granting public lands to the state of Wisconsin, to aid in the construction of railroads in said state," and is in these words:

"That there be, and is hereby, granted to the state of Wisconsin, for the purpose of aiding in the construction of a railroad from Madison, or Columbus, by the way of Portage City, to the St. Croix river or lake, between townships twenty-five and thirty-one, and from thence to the west end of Lake Superior; and to Bayfield; and also from Fond du Lac on Lake Winnebago, northerly to the state line, every alternate section of land designated by odd numbers for six sections in width on each side of said roads respectively. But in case it shall appear that the United States have, when the lines or routes of said roads are definitely fixed, sold any sections or parts thereof granted as aforesaid, or that the right of pre-emption has attached to the same, then it shall be lawful for any agent or agents, to be appointed by the governor of said state, to select, subject to the approval of the secretary of the interior, from the lands of the United States nearest to the tier of sections above specified so much land in alternate sections or parts of sections as shall be equal to such lands as the United States have sold or otherwise appropriated, or to which the right of pre-emption has attached, as aforesaid, which lands (thus selected in lieu of those sold and to which pre-emption has attached, as aforesaid, together with sections and parts of sections designated by odd numbers as aforesaid, and appropriated, as aforesaid) shall be held by the state of Wisconsin for the use and purpose aforesaid: provided, that the lands to be so located shall in no case be further than fifteen miles from the line of the roads in each case, and selected for and on account of said roads: provided, further, that the lands hereby granted shall be exclusively applied in the construction of that road for which it was granted and selected, and shall be disposed of only as the work progresses, and the same shall be applied to no other purpose whatsoever: and provided, further, that any and all lands reserved to the United States by any act of congress, for the purpose of aiding in any object of internal improvement, or in any manner, for any purpose whatsoever, be, and the same are hereby, reserved to the United States from the operation of this act; except so far as it may be found necessary to locate the route of said railroads through such reserved lands, in which case the right of way only shall be granted, subject to the approval of the president of the United States.

"§ 2. That the sections and parts of sections of land which, by such grant, shall remain to the United States within six miles on each side of said roads, shall not be sold for less than double the minimum price of the public lands when sold, nor shall any of said lands become subject to private entry until the same have been first offered at public sale at the increased price.

"§ 3. That the said lands hereby granted to said state shall be subject to the disposal of the legislature thereof, for the purposes aforesaid, and no other, and the said railroads shall be and remain public highways for the use of the government of the United States, free from toll or other charge upon the transportation of property or troops of the United States.

"§ 4. That the lands hereby granted to said state shall be disposed of by

said state only in the manner following, that is to say: that a quantity of land, not exceeding one hundred and twenty sections, and included within a continuous length of twenty miles of roads, respectively, may be sold; and, when the governor of said state shall certify to the secretary of the interior that any twenty continuous miles of either of said roads are completed, then another like quantity of land hereby granted may be sold, and so from time to time until said roads are completed; and if said roads are not completed within ten years, no further sales shall be made, and the lands unsold shall revert to the United States.

"§ 5. That the United States mail shall be transported over said roads, under the direction of the post-office department, at such price as congress may by law direct: provided, that until such price is fixed by law, the postmaster general shall have the power to determine the same." 11 St. 20.

In anticipation, as we suppose, of the passage of this act, the commissioner of the land-office, under date of May 29, 1856, directed the registers and receivers at La Crosse, Hudson, Mineral Point, Menasha, Stevens' Point, and Superior, Wisconsin, to suspend from sale and location all the lands in their respective districts until further orders; and on the 12th of June, 1856, he sent to the same officers a communication in these words:

"By my telegraphic dispatch of the 29th ult., you were requested to suspend from sale or location until further orders all the lands in your districts. The object of this withdrawal was to protect the lands from sale granted to the state for railroad purposes, by a bill which has passed both houses of congress, which having been approved by the president on the 3d instant, and thus become a law, I have to request that you will continue the reservation until otherwise directed. The governor has this day been advised and requested to furnish in advance sketch maps of the route of the roads, with a view of releasing as many of the lands as can be safely returned, without interfering with the public limits of selection, and also of the maps of actual final locations, on the receipt of which latter a further reduction may be made."

The grant contained in the above act was formally accepted by the state by an act approved October 8, 1856, (Gen. Laws Wis. 1856, c. 118;) and, by an act approved October 11, 1856, it conferred the benefit of the grant upon the La Crosse & Milwaukee Railroad Company, a corporation of Wisconsin, (Id. c. 122.)

On the 26th of October, 1856, the commissioner of the general land-office issued an order to the registers and receivers at Superior City, Hudson, and Eau Claire, Wisconsin, in which he said:

"Upon the filing in your office of duly-certified map of the line of route, as definitely fixed, of any of the roads referred to in the act entitled 'An act granting public lands to the state of Wisconsin, to aid in the construction of railroads in such state,' approved June 3, 1856, you will, without waiting for further instructions from this office, cease to permit locations, by entries or pre-emption, or for any purpose whatever, of the land within fifteen miles of said route."

By an act approved March 5, 1857, the St. Croix & Lake Superior Railroad Company, a Wisconsin corporation, was authorized to receive from the La Crosse & Milwaukee Railroad Company all the latter's right, title, and interest in the above lands, or any part thereof, lying north of

the point or place where the road of the La Crosse & Milwaukee Railroad Company "shall intersect the St. Croix river or lake, or other point which may be determined upon by the said last-named company, or such portion of said lands as said companies may agree." P. & L. Laws Wis. 1857, c. 230. Under this act, a deed of division was made March 10, 1857, between the La Crosse & Milwaukee Railroad Company and the St. Croix & Lake Superior Railroad Company. By that deed the former company conveyed to the latter all its interest—

"In and to every alternate section of land, designated by odd numbers, for six sections in width on each side of said road, from the point aforesaid on the St. Croix river or lake to the west end of Lake Superior, and from any point on said last aforesaid route to Bayfield, together with such lands, within fifteen miles of the line or route of said road or roads, as shall be selected, in pursuance of said act of congress, [June 3, 1856,] in lieu of any sections which shall have been sold by the United States, or to which the right of pre-emption has attached."

This deed was recorded in the office of the secretary of state of Wisconsin, November 19, 1857. The map of definite location of the main line of the St. Croix & Lake Superior Railroad Company north from St. Croix river or lake to the west end of Lake Superior was filed March 2, 1858; that of its Bayfield branch, July 17, 1858. These maps were filed under the act of June 3, 1856.

On the 1st of March, 1859, after the final location of the Bayfield branch, the commissioner of the general land-office made an order, addressed to the proper registers and receivers, in these words:

"For your information in the mattter, I inclose herewith a diagram of the district of lands subject to sale at your office, upon which has been designated the line of route and the lines of six and fifteen miles limits of the St. Croix and Lake Superior and the Bayfield line of railroads, to aid in the construction of which a grant of lands was made to the state of Wisconsin by act of June 3, 1856. As all the vacant lands in the odd-numbered sections outside the six and within the fifteen miles limits of the roads have been selected by the agent of the state in lieu of the lands sold and pre-empted in the alternate sections granted by the above-mentioned act, such grant you will of course continue to reserve, as heretofore, from sale or location for any purpose whatever."

Attention will now be given to the act of congress of May 5, 1864, (13 St. p. 66, c. 80.) At the time that act was passed, only 61 miles of the roads contemplated by the act of congress of June 3, 1856, had been constructed, namely, the road from Portage to Tomah. That part was constructed by the La Crosse & Milwaukee Railroad Company in the spring of 1858. Nothing had then been done in respect to other portions of the roads north of Tomah, and towards the west end of Lake Superior and to Bayfield, except to file maps of the definite location of routes; and even that much was not done in relation to the road, mentioned in the act of 1856, from Fond du Lac to Lake Winnebago northerly to the state line.

As the decision of this case turns principally upon the construction to be given to the act of May 5, 1864, its full text will be given. It is en-

titled "An act granting lands to aid in the construction of certain railroads in the state of Wisconsin," and is as follows:

"§ 1. That there be, and is hereby, granted to the state of Wisconsin, for the purpose of aiding in the construction of a railroad from a point on the St. Croix river or lake, between townships twenty-five and thirty-one, to the west end of Lake Superior, and from some point on the line of said railroad, to be selected by said state, to Bayfield, every alternate section of public land, designated by odd numbers, for ten sections in width on each side of said road, deducting any and all lands that may have been granted to the state of Wisconsin for the same purpose by the act of congress of June three, eighteen hundred and fifty-six, upon the same terms and conditions as are contained in the act granting lands to the state of Wisconsin to aid in the construction of railroads in said state, approved June three, eighteen hundred and fifty-six. But in case it shall appear that the United States have, when the line or route of said road is definitely fixed, sold, reserved, or otherwise disposed of, any sections or parts thereof, granted as aforesaid, or that the right of pre-emption or homestead has attached to the same, then it shall be lawful for any agent or agents to be appointed by said company to select, subject to the approval of the secretary of the interior, from the public lands of the United States nearest to the tier of sections above specified, as much land in alternate sections as shall be equal to such lands as the United States have sold or otherwise appropriated, or to which the right of pre-emption or homestead has attached, as aforesaid, which lands, thus selected in lieu of those sold, and to which pre-emption or homestead right has attached, as aforesaid, together with sections and parts of sections designated by odd numbers, as aforesaid, and appropriated, as aforesaid, shall be held by said state for the use and purpose aforesaid: provided, that the lands to be so selected shall in no case be further than twenty miles from the line of the said roads, nor shall such selection or location be made in lieu of lands received under the said grant of June 3, 1856; but such selection and location may be made for the benefit of said state, and for the purpose aforesaid, to supply any deficiency under the said grant of June third, eighteen hundred and fifty-six, should any such deficiency exist.

"§ 2. That there be, and is hereby, granted to the state of Wisconsin, for the purpose of aiding in the construction of a railroad from the town of Tomah, in the county of Monroe, in said state, to the St. Croix river or lake, between townships twenty-five and thirty-one, every alternate section of public land, designated by odd numbers, for ten sections in width on each side of said road, deducting any and all lands that may have been granted to the state of Wisconsin for the same purpose by the act of congress granting lands to said state to aid in the construction of certain railroads, approved June three, eighteen hundred and fifty-six, upon the same terms and conditions as are contained in the said act of June three, eighteen hundred and fifty-six. But in case it shall appear that the United States have, when the line or route of said road is definitely fixed, sold, reserved, or otherwise disposed of any sections, or parts of sections, granted as aforesaid, or that the right of pre-emption or homestead has attached to the same, then it shall be lawful for any agent or agents to be appointed by said state to select, subject to the approval of the secretary of the interior, from the public lands of the United States nearest to the tier of sections above specified, as much land, in alternate sections, or parts of sections, as shall be equal to such lands as the United States have sold or otherwise appropriated, or to which the right of pre-emption or homestead has attached, as aforesaid, which lands, thus selected in lieu of those sold, and to which pre-emption or homestead right has attached, as aforesaid, together with sections and parts of sections designated by odd numbers, as aforesaid, and

appropriated, as aforesaid, shall be held by said state for the use and purpose aforesaid: provided, that the lands to be so located shall in no case be further than twenty miles from the line of said road, nor shall such selection or location be made in lieu of lands received under the said grant of June three, eighteen hundred and fifty-six: but such selections and locations may be made for the benefit of said state, and for the purpose aforesaid, to supply any deficiency under the said grant of June three, eighteen hundred and fifty-six, should any such deficiency exist.

"§ 3. That there be, and is hereby, granted to the state of Wisconsin, for the purpose of aiding in the construction of a railroad from Portage city, Berlin, Doty's island, or Fond du Lac, as said state may determine, in a northwestern direction, to Bayfield, and thence to Superior, on Lake Superior, every alternate section of public land, designated by odd numbers, for ten sections in width on each side of said road, upon the same terms and conditions as are contained in the act granting lands to said state to aid in the construction of railroads in said state, approved June three, eighteen hundred and fifty-six. But in case it shall appear that the United States have, when the line or route of said road is definitely fixed, sold, reserved, or otherwise disposed of any sections or parts thereof, granted as aforesaid, or that the right of pre-emption or homestead has attached to the same, that it shall be lawful 'for any agent or agents of said state, appointed by the governor thereof, to select, subject to the approval of the secretary of the interior, from the lands of the United States nearest to the tier of sections above specified, as much public land in alternate sections or parts of sections, as shall be equal to such lands as the United States have sold or otherwise appropriated, or to which the right of pre-emption or homestead has attached, as aforesaid, which lands, thus selected in lieu of those sold, and to which the right of pre-emption or homestead has attached, as aforesaid, together with sections and parts of sections designated by odd numbers, as aforesaid, and appropriated, as aforesaid, shall be held by said state, or by the company to which she may transfer the same, for the use and purpose aforesaid: provided, that the lands to be so located shall in no case be further than twenty miles from the line of said road.

"§ 4. That the sections and parts of sections of land which shall remain to the United States within ten miles on each side of said roads shall not be sold for less than double the minimum price of the public lands when sold, nor shall any of the said reserved lands become subject to private entry until the same have been first offered at public sale at the increased price.

"§ 5. That the time fixed and limited for the completion of said roads in the act aforesaid of June three, eighteen hundred and fifty-six be, and the same is hereby, extended to a period of five years from and after the passage of this act.

"§ 6. That any and all lands reserved to the United States by any act of congress for the purpose of aiding in any object of internal improvement, or in any manner, for any purpose whatsoever, and all mineral lands, be, and the same are hereby, reserved and excluded from the operation of this act, except so far as it may be found necessary to locate the route of such railroads through such reserved lands; in which case the right of way only shall be granted, subject to the approval of the president of the United States.

"§ 7. That whenever the companies to which this grant is made, or to which the same may be transferred, shall have completed twenty consecutive miles of any portion of said railroads, supplied with all necessary drains, culverts, viaducts, crossings, sidings, bridges, turn-outs, watering places, depots, equipments, furniture, and all other appurtenances of a first-class railroad, patents shall issue conveying the right and title to said lands to the said company entitled thereto, on each side of the road, so far as the same is completed and coterminous with said completed section, not exceeding the amount aforesaid, and patents shall in like manner issue as each twenty miles of said road

is completed: provided, however, that no patents shall issue for any of said lands unless there shall be presented to the secretary of the interior a statement, verified on oath or affirmation by the president of said company, and certified by the governor of the state of Wisconsin, that such twenty miles have been completed in the manner required by this act, and setting forth with certainty the points where such twenty miles begin and where the same end, which oath shall be taken before a judge of a court of record of the United States.

"§ 8. That the said lands hereby granted shall, when patented as provided in section seven of this act, be subject to the disposal of the companies respectively entitled thereto, for the purpose aforesaid, and no other; and the said railroads shall be and remain public highways for the use of the government of the United States, free from all toll or other charge, for the transportation of any property or troops of the United States.

"§ 9. That if said road, mentioned in the third section aforesaid, is not completed within ten years from the time of the passage of this act, as provided herein, no further patents shall be issued to said company for said lands, and no further sale shall be made, and the lands unsold shall revert to the United States." 13 St. 66.

By an act of the Wisconsin legislature, approved March 20, 1865, the benefit of this act, so far as it related to the road from the St. Croix river or lake to the west end of Lake Superior and to Bayfield, was granted to the St. Croix and Lake Superior Railroad Company, subject to all the conditions and restrictions imposed upon the state by the said acts of May 5, 1864, and June 3, 1856. Gen. Laws Wis. 1865, c. 175, § 1. This was the same corporation, already referred to, that was allowed to receive from the La Crosse & Milwaukee Railroad Company the benefit of the act of June 3, 1856, relating to the same line of roads.

On the 22d of April, 1865, the St. Croix and Lake Superior Railroad Company, by its executive committee, accepted the grant of lands made by the act of congress of 1864, and by the above act of the Wisconsin legislature of March 20, 1865, so far as it related to the road from the St. Croix river or lake to the west end of Lake Superior and to Bayfield. That committee also passed a resolution declaring "that the line as now located by maps on file in the land-office at Washington be the line adopted for the selection of lands conferred on this company by grant."

The plaintiff, the Wisconsin Central Railroad Company, to be hereafter called the "Central Company," was formerly the Portage, Winnebago & Superior Railroad Company, the latter having been formed in 1869 by the consolidation of the Portage & Lake Superior Railroad Company and the Winnebago & Lake Superior Railroad Company; the two constituent companies having been incorporated in 1866 for the purpose, as recited in the titles of their respective acts of incorporation, of executing the trust created by the act of congress of May 5, 1864. P. & L. Laws Wis. 1866, cc. 314, 362; 1869, c. 257; 1871, c. 27. It is not controverted, in the present case, that the Central Company succeeded to all the rights conferred by the state upon the companies to which were transferred the benefit of the grant of lands contained in the third section of the act of May 5, 1864. Nor is it controverted that the road of the Central Company from Stevens' Point to Lake Superior, al-

though not on the precise lines originally specified, was constructed to Ashland, on Lake Superior, in accordance with the acts of congress and of the legislature of Wisconsin. It was definitely located November 10, 1869. Its map of definite location was filed in the proper office, and it appeared in evidence that the commissioner of the general land-office, on the 10th of December, 1869, sent to the register and receiver at Bay-field, Wis., "a diagram of the Portage, Winnebago, and Superior Rail-road, under act of May 5, 1864, third section, and joint resolutions 21st June, 1866, (14 St. 360,) within the ten and twenty mile limits of the land grant designated thereon," and directed them to withdraw "from sale or location, pre-emption or homestead entry, all the odd-numbered sections of lands falling within those limits."

The road from the St. Croix river or lake to Superior, on Lake Superior, and the Bayfield branch, were constructed and are owned and operated by the Chicago, St. Paul, Minneapolis & Omaha Railroad Company, to be hereafter, for the sake of brevity, called the "Omaha Company," the successor of the St. Croix & Superior Railroad Company, and the owner of the rights and privileges granted to the latter company in respect to the above road and branch. The road located under the act of 1856 from a point north of St. Croix river or lake to Bayfield approaches that of the Central Company, located under the act of 1864, as the latter proceeds in a north-westerly course to Ashland, and both the place and indemnity limits of the Central road conflict with or overlaps the original 15-mile indemnity limits of the Bayfield branch of the Omaha Company.

On the 12th of February, 1884, the Central Company and the Omaha Company entered into an agreement for the adjustment of the controversy between them as to the land in the overlap of the grants made by the acts of congress of June 3, 1856, and May 5, 1864. By that agreement the Omaha Company consented that the Central Company should "take patents for all the lands in the overlap lying east of the easterly ten-mile limit of the Bayfield branch of the Omaha Company, and north and east of the westerly ten-mile limit of the Central Company;" while the Omaha Company was to have all the other lands within the overlap of those grants.

The Central Company, having constructed roads from Portage city and from Menasha, or Doty's island, to Stevens' Point, thence to Ashland, on Lake Superior, in conformity with the acts of congress and of Wisconsin, received from the state, February 25, 1884, a patent "for so much of said lands granted aforesaid as are situated on either side of, and coterminous with, said completed portions of said road." The lands in dispute are covered by that patent.

On the 19th of February, 1887, the Omaha Company executed to the Central Company a deed of release as to certain lands, described by metes and bounds; the deed reciting that the former company intends to surrender to the latter company—

"All lands within the overlapping limits of said grants which lie easterly of the easterly ten-mile limit of the Bayfield branch of said Chicago, St. Paul,

Minneapolis and Omaha Railway, and northerly and easterly of the westerly ten-mile limit of the Wisconsin Central Railroad Company; and hereby consents that said lands be conveyed by the United States to the state of Wisconsin, for the use and benefit of the Wisconsin Central Railroad Company, or that the same be patented by the United States to said Wisconsin Central Railroad Company, as may be appropriated in accordance with the selection thereof heretofore made, or hereafter to be made, by or for said Wisconsin Central Railroad Company, as of lands within its land grant, under said acts of congress above mentioned."

In the year 1887, the Omaha Company applied to the general land-office for the final adjustment of its land grants under the acts of June 3, 1856, and May 5, 1864. Upon the hearing of that application, it was, among other things, determined, October, 1887, by the secretary of the interior, upon appeal from the commissioner of the land-office, that the lands within the 15-mile indemnity limits of the Bayfield road, as defined in the act of 1856, were, by virtue of the orders of the secretary, "reserved to the United States," and were not included in the grant in the act of 1864 for the road named in its third section, now the Central Railroad, and were so reserved before the passage of the act of 1864, for the purpose of indemnifying the Bayfield road for losses, if any should occur, in its place limits. To that proceeding the Central Company was not a party, and of its institution and pendency had no notice. 6 Dec. Dep. Int. 190, 194, 196, 209, 210, 217.

On the 2d of July, 1887, the Central Company listed in the land department a large quantity of lands, including the lands in dispute, as having inured to it under and by section 3 of the act of May 5, 1864.

After the decision of the secretary of the interior, above referred to, the Central Company appeared before the land department, and demanded a hearing on the above question determined at the time of the adjustment of the grant of the Omaha Company, claiming that such determination was not binding upon it; that it was not a party to, and had not been heard in, the proceeding in which it was made; that the lands listed by it were not excluded from the grant in section 3 of the act of 1864; that their withdrawal by the secretary was not a reservation to the United States, within the meaning of section 6 of that act; and that, if such withdrawal amounted to such a reservation, it was revoked and terminated by the act of May 5, 1864. Upon this application, the above question was reargued before the secretary of the interior, in the present year, upon an appeal to him by the Central Company. It was held by Secretary Noble, in harmony with the ruling of Secretary Lamar, that the lands within the limits of the indemnity withdrawal made for the benefit of the Bayfield road, were, by section 6 of the act of May 5, 1864, excluded from the grant contained in the third section of that act for the Central road; and that the title to all lands within such indemnity withdrawal for the Bayfield road, not ultimately required for the indemnity purposes for which it was made, remained in the United States. 10 Dec. Dep. Int. 63, 77.

Shortly after the decision last referred to, the defendant, being a citizen of the United States, and over 21 years of age, made a formal entry

of the lands in dispute, taking all the steps, and paying all the charges and fees, required by law for such entry.

The lands in dispute, part of those so listed by the plaintiff, are, we may repeat, outside and east of the enlarged place limits—10 sections in width on each side of the Bayfield branch of the Omaha road—as established by the first section of the act of 1864, but (and this is an important fact in the case) are within the 15-mile indemnity limits of that road, as those limits are defined by the act of 1856. It is also necessary to observe that they are within the place limits—10 sections in width on each side—of the Central road, as established by the third section of the act of 1864. The contention of the plaintiff is, that, as the grant in that section was one *in præsenti*, these lands, upon the filing and acceptance of its map of definite location, became its property, as of the date of the act of 1864, subject only to the condition, if its road was not completed within the time prescribed by congress, "no further patents shall be issued to said company for said lands, and no further sale shall be made, and the lands unsold shall revert to the United States." 13 St. p. 68, c. 80, § 9.

It cannot be disputed that the grant of lands in the act of 1856 for the benefit of the Bayfield road was also one *in præsenti;* that prior to the passage of the act of 1864, the company constructing that road had, by the filing and acceptance of its map of definite location, earned its place lands, subject only to the condition, prescribed in the fourth section of the act of 1856, that if the road was not completed within the time designated, such lands as remained unsold should revert to the United States. Nor can it be disputed that, prior to 1864, all the lands within the 15-mile indemnity limits of that road, of which those here in dispute formed a part, had been lawfully withdrawn from sale or location, in order that the state, with the approval of the secretary of the interior, might select therefrom lands to supply deficiencies that may have resulted from previous sales or appropriations by the United States of lands within the place limits of that road, as defined by the act of 1856. And yet it is said that congress intended by the third section of the act of 1864 to grant to the state, for the benefit of another road, whose route had not then been located, such part of the indemnity lands of the Bayfield branch as fell within the designated place limits of that other road. It is argued that to this extent, at least, the act of 1856 was superseded and repealed by that of 1864.

At the threshold of the inquiry as to whether the act of 1856 was repealed or superseded, we are confronted with these facts: That the act of 1864 contains no words of repeal; that it does not, in terms, disturb any legal right which had accrued or become vested under the former act; that its first section recognizes the indemnity limits of the Bayfield road as embracing the lands in dispute quite as distinctly as the third section, construed alone, puts them in the place limits of the road mentioned in it; that in four out of nine sections of the act of 1864 the act of 1856, with its terms and conditions, is referred to, and its continuing existence, at least for some purposes, is recognized; that when the act of

1864 was passed, only eight of the ten years given in the act of 1856 for the completion of the roads therein mentioned had expired; and that the act of 1864, so far from superseding altogether the act of 1856, extends "the time fixed and limited for the completion of the said roads in the act aforesaid of June 3, 1856," to a period of five years from and after the passage of the act of 1864, while it gives ten years from its passage for the completion of the road mentioned in the third section; thus putting the Central road upon a different footing as to time from that prescribed as to the roads mentioned in the act of 1856.

These facts may not be conclusive against the suggestion of repeal, but they certainly tend to show that congress did not intend to wholly displace the act of 1856.

The act of 1864 undoubtedly took the place of that of 1856 for certain purposes. While, as was held by this court in *Madison & Portage R. Co.* v. *State of Wisconsin, etc.*, decided in 1879, the act of 1856 contemplated or rendered possible the construction by one company of a single continuous road from Madison or Columbus, via Portage City and St. Croix river or lake, to the west end of Lake Superior and to Bayfield, the continuity of such line was destroyed by the act of 1864, which both divided and enlarged the grant made by congress in 1856. In the case just cited it was said:

"This course was, perhaps, suggested by the fact, of which we may presume congress had knowledge, that nearly eight years had elapsed after the state's acceptance of the act of June 3, 1856, without anything whatever being done upon the line west and north of Tomah, beyond the mere location of the route from Tomah, via St. Croix river or lake, to Lake Superior. But, whatever considerations may have influenced congress, we are satisfied that the purpose of the act of May 5, 1864, was to break the continuity of the original line from Tomah, via St. Croix river or lake, to the west end of Lake Superior and to Bayfield, and to devote to the construction of separate and distinct portions of that line an increased quantity of lands beyond the amount granted by, or which could have been made available under, the act of 1856."

In the same case, it was held that congress intended that all the lands granted by and earned under the act of May 5, 1864, by means of constructed road, should be disposed of according to the coterminous principle, under which each road would get the benefit of the lands granted by and earned under that act that were coterminous with each completed section of 20 miles,—a mode of disposing of them not absolutely required by the act of 1856. In these and perhaps in other respects, not material to be considered, the act of 1864 took the place of, or superseded, the act of 1856. But did it operate to displace the first act to the extent claimed by the plaintiff?

The first section of the act of 1864 certainly gives no support to the position taken by the plaintiff. It discloses, as we have said, no purpose upon the part of congress to disturb or displace any substantial right vested or acquired under the former act, or to cripple any railroad company that had proceeded under the act of 1856. It does not make an entirely new, independent grant, as of its date, of place lands to the extent of 10 full sections in width on each side of the particular roads

therein mentioned, with indemnity limits of 20 miles. It is, in legal effect, as was substantially decided in the *Madison-Portage Case*, a grant of 4 *additional* sections in width of place lands, with indemnity limits enlarged from 15 to 20 miles, and a confirmation of the previous grant of 6 sections in width of place lands, with 15 miles indemnity limits. It converted 4 miles of the indemnity limits, as defined in the act of 1856, into place limits of the road to Bayfield, and added 5 miles on each side of the place limits, thus enlarged, to the indemnity limits. But it left untouched the grant, made in 1856, for the same line of road, of 6 sections in width on each side, with indemnity limits of 15 miles. This view is fortified by the explicit recognition, in the first section of the act of 1864, of the fact that the additional lands therein granted are for the "same purpose" as were the lands originally granted by the act of 1856, which the act of 1864 required to be "deducted" from the aggregate of 10 sections in width on each side of the road, thereafter to constitute the place limits of the Bayfield branch. The first section of the act of 1864 should receive the same construction that would be given if it had, in words, *added* four sections in width to the place limits, and five miles to the indemnity limits, on each side of the road. The result, according to this view, is that, except as to that part of the indemnity lands converted by the first section of the act of 1864 into place lands of the Bayfield road, the order of the secretary, made prior to that year, withdrawing from sale and location for the benefit of that road its entire indemnity lands, was not abrogated or annulled by that act. So far from congress intending to deprive the Bayfield road of any part of its original indemnity lands, it put a part of them in its place limits, and increased its indemnity limits by five miles.

If this interpretation of the first section of the act of 1864 should be wrong, and if that section should be construed as making an entirely new, independent grant, as of the date of that act, of 10 sections in width, with indemnity limits of 20 miles on each side of the road, the result would be that congress, by the same act, embraced the lands in dispute within the indemnity limits of the Bayfield road, and within the place limits of the Central road. And such we understand to be, substantially, the position of the plaintiff; for it contends that the act of 1864 superseded and took the place of the act of 1856 in all material respects, "so that the grants of the Omaha Company and of the Central Company were in fact contemporaneous grants." A view somewhat similar was presented at the argument of the case of *Madison & P. R. Co.* v. *State.* The court then said:

"Although the Wisconsin Central Railroad Company has filed no cross-bill, and has only presented its claims by answer, it may not be improper for us to express an opinion upon the effect of the grant by the act of 1864, when there is a conflict or overlapping of lands granted to the different railroads as they approach Lake Superior; large quantities of lands being thus granted by the act to the different roads. These grants are made by the same law operating on the lands granted at the same time. The Wisconsin Central Railroad has completed its road to Ashland, on Lake Superior, a point not named in the act; but up to the present time no road has been finished to Bayfield,

or to the west end of Lake Superior, and, without foreclosing the parties upon this question, we should be inclined to think that the different companies, as to all lands overlapping in the respective grants, must be considered tenants in common, without regard to priority of construction."

The court concedes the force of the suggestion that what appears in the above extract from the opinion in the former case was not absolutely necessary to the determination of any specific issue therein made, in respect to which affirmative relief could have been given. It is now alluded to for the purpose of saying that, if the present case depended upon the first and third sections of the act of 1864, without reference to the sixth section, there would be ground for holding, in respect to the particular lands in dispute, and other lands similarly situated, that the Omaha Company and the Central Company became tenants in common, without regard to priority of construction; in which event the agreement between them, the deed of release from the Omaha Company, and the patent from the state, might perhaps be sufficient to sustain the title of the plaintiff as against the defendant. But no question was made in the former case as to the scope of section 6 of the act of 1864, nor was there any question in that case as to the effect of the withdrawal, prior to the act of 1864, from sale or location, and for the benefit of the Bayfield road, of lands that are within the outer boundaries of the place limits of the road, mentioned in the third section of that act. There was, consequently, no occasion to consider, and the court did not determine in the former case, the question whether the lands here in dispute, or any lands similarly situated, were excluded from the operation of the act of 1864 in virtue of its sixth section, and by reason of the secretary's previous orders withdrawing them from sale or location.

We proceed now to inquire whether the lands in dispute were in fact *granted* by the third section of the act of 1864. That section grants to the state, to aid in the construction of the road therein mentioned, "every alternate section of public land, designated by odd numbers, for ten sections in width on each side of said road;" and we have seen that the lands in dispute constitute part of some of those odd-numbered sections. But the sixth section expressly *reserves* and *excludes from the operation of the act,* not only mineral lands, but "any and all lands reserved to the United States by any act of congress, for the purpose of aiding in any object of internal improvement, or in any manner, for any purpose whatsoever." If, when the act of 1864 was passed, those lands were "reserved to the United States * * * in any manner, for any purpose whatsoever," then they were expressly excluded from the operation of the act, and therefore were not granted. Were they not so reserved by the order of the secretary of the interior, which had not been modified or rescinded by him when the act of 1864 was passed? The plaintiff insists that, while they may have been regarded as reserved for the benefit of a particular road, they were not, within the meaning of the act, reserved "to the United States." This position cannot be sustained, in view of the decisions of the supreme court of the United States.

The lands embraced in the withdrawals, although held as indemnity

lands, belonged to the United States. It had never parted with its interest in them, nor lost its right to control them absolutely. Its title to them was complete, because, as shown by adjudged cases, to be hereafter cited on another point, although withdrawn from sale or location in order that losses, when ascertained, in the place limits of the Bayfield road, might be supplied by selections from them, *the title, the right of property* of the United States, remained unaffected *until such selections were actually made and approved.* They were, it is true, selected in mass by the state's agent after the map of definite location of the Bayfield road was filed and approved; but such general selection did not change the right of property, for no particular lands were set apart by the land department to supply any ascertained losses in place limits. The reservation of them was solely to the end that the United States might, at the proper time, use them in meeting its obligations on account of the Bayfield road. In every sense, therefore, they were, by competent authority, "reserved to the United States;" that is, retained by the United States as lands not granted, and therefore as its property. The withdrawal of them from sale or location, under the general laws providing for the administration of the public domain, was a reservation of them by and to the United States; and that was their condition when the act of 1864 was passed.

Here we are met with the inquiry, whether congress could have intended, in respect to the road mentioned in the third section of the act of 1864, to make to the state a grant that would cover these lands, and, by the sixth section of the same act, exclude them altogether from the grant. This is hardly an accurate or full statement of the case. The question, as propounded, assumes the very matter to be decided. It assumes that congress intended, at all events, by the third section of the act of 1864, to *grant* these lands, and other lands similarly situated, as place lands of the road mentioned, to become, as of the date of the grant, the property of the company constructing that road, when its route was finally located. Such assumption might be justified, if we looked alone to the third section. We cannot, however, in construing the act, ignore the first and sixth sections. The entire act must be taken together and in connection with the act of 1856, in order to ascertain the will of congress. Looking at the sixth section of the act of 1864, in connection with the third, it is clear that the words of the latter section are subject to the express condition, contained in the former, that the grant shall not include any lands "reserved to the United States. * * * in any manner, for any purpose whatsoever." The sixth section should receive the same construction precisely that would be given if it had been simply a proviso of the third section. It is as if congress had declared in words: We give to the state, for the benefit of the road to be constructed from Portage City, Berlin, Doty's island, or Fond du Lac, in a north-western direction, to Bayfield, thence to Superior, on Lake Superior, every alternate section of public land designated by odd numbers, for ten miles in width on each side of the road, except or excluding such lands within those limits as are reserved to the United States in any manner, for any purpose whatsoever.

This construction, it is contended, cannot be sound, as it would deprive even the road mentioned in the first section of the act of 1864 (the Bayfield branch) of the benefit of all the lands withdrawn from sale or location by the secretary's order; and this, for the reason that the broad language of the sixth section of the act of 1864 embraces every road in that act mentioned. Not at all; for, as heretofore shown, the lands in dispute constituted a part of the indemnity lands of the Bayfield road under the act of 1856, the general purposes, terms, and conditions of which are recognized by the act of 1864. Whatever rights that road had in respect to those particular lands arose under the act of 1856, and did not come from what may be regarded as the "new grant," in the act of 1864, giving *additional* place lands, with enlarged indemnity limits. Even if it were true that the grant in the act of 1856 for the Bayfield road was a new grant as to all of the lands within the place limits of that road as enlarged by the act of 1864, the result would be the same; for in the case supposed there would be ground to hold that the sixth section excluded the lands in dispute from the act of 1864; in which event, so far as the Omaha and Central Companies were concerned, they would have been regarded as "reserved to the United States," and therefore excluded altogether from the operation of the act.

We think that some confusion has come into this case by reason of the fact that the grant for the Central road is in the same act that enlarges the grant made for the Bayfield road in 1856. Let us suppose that the act of 1864 had made no reference whatever to the act of 1856, and had contained only a grant to the state, in the words of the third section of the former act, accompanied by a distinct clause or section, reserving and excluding from the operation of the act any and all lands "reserved to the United States" either by an act of congress or in any other manner, for any purpose whatsoever. Would it be pretended that such an act granted to the state the lands previously included in the indemnity limits of another road, whose route had then been definitely located, and whose indemnity lands had been withdrawn and reserved from sale or location by the secretary of the interior, in order to supply deficiencies, if any were found to exist, in the place limits of that other road? We think not. And yet there is really no difference in law between the case now before us and the case supposed.

That we have not given undue weight to the secretary's order of withdrawal, or misinterpreted it, is abundantly established by decisions of the supreme court in cases somewhat similar to the present one. These decisions, whatever might be the view of this court as to the meaning of the words "reserved to the United States," if the question were for the first time presented for determination, leave no room for doubt as to our duty in the present case. In 1846, congress, "for the purpose of aiding the territory of Iowa to improve the navigation of the Des Moines river from its mouth to the 'Raccoon Fork,' so called," made a grant to that territory of—

"One equal moiety, in alternate sections, of the public lands remaining unsold, and not otherwise disposed of, incumbered, or appropriated, in a strip

five miles in width on each side of said river, to be selected within said territory by an agent or agents to be appointed by the governor thereof, subject to the approval of the secretary of the treasury of the United States." 9 St. c. 103, § 1.

The Des Moines river rises in the northern part of Iowa, and empties into the Mississippi at the south-east corner of that state. The Raccoon fork, coming from the north-west, enters the Des Moines river, near the center of the state, many miles above the mouth of that river. Subsequently, on the 15th of May, 1856, congress granted to the state of Iowa, for the purpose of aiding in the construction of certain railroads within its limits, every alternate section of land, designated by odd numbers, for six sections in width on each side of each of said roads, with a proviso substantially in the words of the sixth section of the act of May 5, 1864, now before us. That proviso (the italics are ours) was in these words:

"That any and all land heretofore *reserved to the United States* by any act of congress, or *in any other manner, by competent authority*, for the purpose of aiding in any objects of internal improvements, *or for any purpose whatsoever*, be, and the same is hereby, reserved from the operation of this act, except so far as it may be found necessary to locate the routes of the said railroads through such reserved land, in which case the right of way shall be granted, subject to the approval of the president of the United States." 11 St. p. 9, c. 28, § 1.

In *Railroad Co.* v. *Litchfield*, 23 How. 66, it was decided that the grant of 1846 did not include lands *above* Raccoon fork,—that is, lands north and west of its junction with the Des Moines river; but only lands below such junction within the prescribed distance from the river. In *Wolcott* v. *Navigation Co.*, 5 Wall. 681, 687, which involved the title to certain lands covered by the above grant of 1846, it appeared that in August, 1859, the Des Moines Navigation Company, to which the state, succeeding to the rights of the territory, had in May, 1858, transferred the land granted to the territory, conveyed to Wolcott a half section within five miles of Des Moines river, but situated above the junction of Raccoon fork with that river, and warranted the title. At the date of the passage of the act of May 15, 1856, the odd-numbered sections within five miles of Des Moines river, above the point where the Raccoon fork empties into it, had been reserved, not in terms "to the United States," but from sale by the proper officer having charge of the public lands. That reservation was made in the belief, shared by many public officers, that the grant of 1846 included the odd-numbered sections above, as well as those below, that fork, within the prescribed distance from the river. The question presented was as to the scope and effect of the proviso in the act of 1856. It was admitted that the grant to Iowa by the act of May 15, 1856, for the benefit of the railroads named in it, embraced the lands there in dispute, unless they were excluded by the above proviso. This court said:

"We think it difficult to resist the conclusion that congress, in the passage of the proviso, had specially in their minds this previous grant, and the conflict of the opinion concerning it, and intended to reserve the lands for further dis-

position, if the title under the first grant should turn out to be defective. The decision of this court had not then taken place, though the litigation was probably pending in the court below, in the district of Iowa. The words of the proviso point almost directly to this grant, and to the dispute arising out of it among the public authorities: 'All lands heretofore reserved,' etc., 'by any act of congress, or in any other manner by competent authority, for the purpose of aiding in any objects of internal improvements,' etc. These improvements of the Des Moines river were then in progress. Now, if it had turned out that the true construction of the act carried the grant above the Raccoon fork, then the lands would have been reserved by the act of congress, and no further legislation necessary. But, not satisfied with this, as if to provide for any result in respect to the title to them, if reserved in any other manner by competent authority, for the object of internal improvements, then the enacting clause should not operate to carry them under the new grant.

"It has been argued that these lands had not been reserved by competent authority, and hence that the reservation was nugatory. As we have seen, they were reserved from sale for the special purpose of aiding in the improvement of the Des Moines river, first, by the secretary of the treasury, when the land department was under his supervision and control, and again by the secretary of the interior, after the establishment of this department under instructions from the president and cabinet. Besides, if this power was not competent, which we think it was ever since the establishment of the land department, and which has been exercised down to the present time, the grant of 8th August, 1846, carried along with it, by necessary implication, not only the power, but the duty, of the land-office to reserve from sale the lands embraced in the grant. Otherwise, its object might be utterly defeated. Hence, immediately upon a grant being made by congress for any of those public purposes to a state, notice is given by the commissioner of the land-office to the registers and receivers to stop all sales, either public or by private entry. Such notice was given the same day the grant was made, in 1856, for the benefit of these railroads. That there was a dispute existing as to the extent of the grant of 1846 in no way affects the question. The serious conflict of opinion among the public authorities on the subject made it the duty of the land-officers to withhold the sales, and reserve them to the United States till it was ultimately disposed of."

These observations are pertinent to the case in hand. What was said in the *Wolcott Case* by the supreme court of the United States bears directly upon the inquiry whether the reservation by the secretary of the interior from sale or location of the lands within the indemnity limits of the Bayfield road was not a reservation "to the United States." In that case the withdrawal of lands from sale or location was distinctly characterized as a reservation of that class. The decision fully sustains the view that the lands embraced by the secretary's order of withdrawal in the present case were "reserved to the United States." It is peculiarly strong in its application here, by reason of the fact that the lands "reserved" in the Iowa case were not in fact embraced by congress in the grant of 1846, and consequently could not rightfully be used for the purposes for which they were withdrawn. The decision in *Wolcott* v. *Navigation Co.* was approved and followed in many subsequent cases: *Homestead Co.* v. *Valley R. Co.*, 17 Wall. 153; *Wolsey* v. *Chapman*, 101 U. S. 755; *Litchfield* v. *County of Webster*, Id. 773; *Dubuque*, etc., *R. Co.* v. *Des Moines Val. R. Co.*, 109 U. S. 329, 3 Sup. Ct. Rep.

188.   See, also, *Williams* v. *Baker*, 17 Wall. 144, and *Bullard* v. *Railroad Co.*, 122 U. S. 167, 7 Sup. Ct. Rep. 1149.   In our judgment, these cases control the decision of the present case so far as it depends upon the question whether the lands in dispute were "reserved to the United States" when the act of 1864 was passed.   If the lands involved in the *Wolcott Case* were, within the meaning of the act of May 15, 1856, "reserved to the United States," for the purposes of the grant to Iowa in 1846, although they were not, in fact, embraced by that grant, and could not be used in executing it, much more would it be held that the lands within the original indemnity limits of the Bayfield road, reserved by the secretary's order of withdrawal, were, within the meaning of the sixth section of the act of 1864, "reserved to the United States."

Another contention upon the part of the plaintiff is that, even conceding that the lands in dispute were reserved by virtue of their being withdrawn, prior to 1864, for indemnity purposes, yet, as the object for which the withdrawal was made, namely, to supply deficiencies in the place limits of the Bayfield road, were fully satisfied, before the defendant made his entry, by the final adjustment of the land grant for the Omaha road, the lands so withdrawn would be affected by the granting clause in the third section of the act, and so become and be the property of the Central Company under that section.   This view is in opposition to many adjudged cases.   Whatever force it might have in the case of two contemporaneous grants to different companies, covering the same land, in neither of which an exception was made of lands "reserved to the United States," it can have no application where, as in the present case, the statute expressly reserves and excludes from its operation any and all lands so reserved.   If these lands were reserved when the act of 1864 was passed, they certainly were not granted by the third section of that act to the Central road, and could not get into the grant to, and become the property of, the Central Company, by reason simply of their not being required for the adjustment of a different grant, made for another road.   This view is illustrated by several cases.   In *Railway Co.* v. *Dunmeyer*, 113 U. S. 629, 5 Sup. Ct. Rep. 566, the question was whether lands to which a claim of homestead "attached" after the passage of an act granting lands to a railroad company, but before its line was definitely located, reverted to the company, and became a part of its grant, by reason of the failure of the "homesteader" to perfect his claim in the mode required by law.   It was held that they did not, for the reason that the grant to the railroad company was of lands within certain prescribed limits as to quantity and location, "not sold, reserved, or otherwise disposed of by the United States, and to which a pre-emption or homestead claim may not have attached at the time the line of said road is definitely located."   It was adjudged that the lands to which the homestead claim had attached could not be included in the grant to the railroad company.   The court said:

"No attempt has ever been made to include lands reserved to the United States, which reservation afterwards ceased to exist, within the grant, though this road, and others with grants in similar language, have more than once

passed through military reservations for forts and other purposes which have been given up or abandoned as such reservations, and were of great value. Nor is it understood that in any case where lands had been otherwise disposed, their reversion to the government brought them within the grant. Why should a different construction apply to lands to which a homestead or pre-emption right has attached? Did congress intend to say that the right of the company also attached, and whichever proved to be the better right should obtain the land? * * * The reasonable purpose of the government undoubtedly is that which is expressed, namely, while we are giving liberally to the railroad company, we do not give any lands we have already sold, or to which, according to our laws, we have permitted a pre-emption or homestead right to attach. No right to such land passes by this grant. * * * It necessarily means that, if such rights have attached, they [the lands] are not granted."

So in *Bullard* v. *Railroad Co.*, 122 U. S. 167, 176, 7 Sup. Ct. Rep. 1153:

"The object of the bill is to have a declaration of the court that the title of the plaintiff under these settlements and pre-emptions is superior to the title conferred by congress on the state of Iowa, and her grantees, under the act of July 12, 1862. If the lands at the time of these settlements and pre-emption declarations were effectually withdrawn from settlement, sale, or pre-emption, by orders of the department, which we have considered, there is an end to the plaintiff's title, for by that withdrawal or reservation the lands were reserved for another purpose, to which they were ultimately appropriated by the act of 1862, and no title could be established, because the land department had no right to grant it."

In *Railroad Co.* v. *Whitney*, 132 U. S. 357, 10 Sup. Ct. Rep. 112, the contest was between a railroad company, claiming under a grant of lands made in 1866 to the state of Minnesota, similar to the one involved in the *Dunmeyer Case*. Before the passage of the act, namely, in 1865, one Turner took certain preliminary steps, under the homestead laws of the United States, for the entry of the lands there in dispute. The entry made by him was, however, canceled in 1872; and in 1877 the same lands were entered by Mrs. Whitney as a homestead. The grant of 1866 excepted lands to which a right of homestead or pre-emption "had attached." The claim of the railroad depended upon the question whether the lands came into the grant of 1866, upon the cancellation in 1872 of the entry made by Turner in 1865. It was held that Turner's entry, not being void upon its face, operated to exclude the land from the railroad grant, and that, upon the cancellation of such entry, the tract in question did not inure to the benefit of the company, but reverted to the government, and became a part of the public domain, subject to appropriation by the first legal applicant.

These cases are, in the judgment of this court, conclusive against the contention that the lands here in dispute became part of the place lands of the Central road, after the grant for the benefit of the other road had been finally adjusted with the Omaha Company, and satisfied with other lands.

It remains to consider the claim of the plaintiff, based upon the agreement between it and the Omaha Company and the deed of release by

the latter to the former company. Although the lands in dispute were withdrawn from sale or location for the benefit of the Bayfield branch of the Omaha Company, and although the orders of withdrawal were in force at the date of the execution of the above agreement and deed of release, we cannot see that the Omaha Company had any legal interest in these lands which at the date of that agreement and deed could have been transferred by it to the Central Company. When the agreement and deed were made, the lands in dispute had not been specially selected and set apart for the purpose of supplying deficiences in the place limits of the Bayfield road. Until so selected and set apart with the approval of the land department, they remained, in the fullest legal sense, the property of the United States. In *Barney* v. *Railroad Co.*, 117 U. S. 228, 232, 6 Sup. Ct. Rep. 654, the court said:

"In the construction of land-grant acts in aid of railroads, there is a well-established distinction observed between 'granted lands' and 'indemnity lands.' The former are those falling within the limits specially designated, and the title to which attaches, when the lands are located, by an approved and accepted survey of the line of the road filed in the land department as of the date of the act of congress. The latter are those lands selected in lieu of parcels lost by previous disposition or reservation for other purposes, and the title to which accrues only from the time of their selection."

So in *Sioux City, etc., R. Co.* v. *Chicago, etc., Ry. Co.*, 117 U. S. 406, 408, 6 Sup. Ct. Rep. 790:

"No title to indemnity lands was vested until a selection was made by which they were pointed out and ascertained, and the selection made approved by the secretary of the interior."

The same view was recently expressed in *Wisconsin Cent. R. Co.* v. *Price Co.*, 133 U. S. 496, 513, 10 Sup. Ct. Rep. 341, where one of the questions was as to the right of the state of Wisconsin to tax, as against a railroad company, certain lands within indemnity limits, that had been selected and reported to the secretary of the interior to be taken in lieu of lands lost in the company's place limits. But at the time the tax was assessed, that officer had not approved such selection. It was held that the approval of the secretary was essential to the efficiency of the selections, and to give to the company any title to the lands selected. After observing that his action was judicial, not ministerial, the court said:

"He [the secretary] was required to determine, in the first place, whether there were any deficiencies in the land granted to the company which were to be supplied from indemnity lands; and, in the second place, whether the particular indemnity lands selected could be properly taken for those deficiencies. In order to reach a proper conclusion on these two questions, he had also to inquire and determine whether any lands in the place limits have been previously disposed of by the government, or whether any pre-emption or homestead rights had attached before the line of the road was definitely fixed. There could be no indemnity unless a loss was established. * * * Until the selections were approved, there were no selections in fact, only preliminary proceedings taken for that purpose; and the indemnity lands remained unaffected in their title. Until then the lands which might be taken as indemnity were incapable of identification. The proposed selections remained the property of the United States. The government was, indeed, un-

der a promise to give the company indemnity lands in lieu of what might be lost by the causes mentioned. But such promise passed no title, and, until it was executed, created no legal interest which could be enforced by the courts."

It results from these cases that the agreement between the Omaha Company and the Central Company that the lands in dispute should, as between those companies, belong to the latter corporation, had no effect whatever upon the title or right of property of the United States. If at that time the lands had been actually set apart for the Bayfield road by approved selections, to supply ascertained deficiences in the place limits of that road, a different question would have been presented for determination.

It was stated at the bar that the decision of this case, and of two other cases in ejectment, tried at the same time, and depending upon the same facts, would indirectly affect the title to large tracts of land, in the same situation as the particular lands here in dispute, and which have been heretofore sold, in good faith, by the Central Company, to *bona fide* purchasers, in the belief that they were embraced in the grant contained in the third section of the act of May 5, 1864, and not excluded from the operation of that act by the sixth section relating to lands reserved to the United States; and that a decision in favor of the defendant in the present case would produce great confusion and trouble among such purchasers. In view of this statement, the court has felt it to be its duty to embody in this opinion all the material facts shown in evidence, and to state fully the grounds upon which its conclusion rests. That conclusion is:

That the lands in dispute were not granted by the United States for the benefit of the road mentioned in the third section of the act of May 5, 1864, and that the grant in the first section of the act of 1856 for the benefit of the railroad, beginning at a point on the line from the St. Croix river or lake to the west end of Lake Superior, and extending to Bayfield, having been fully adjusted by the United States with the only company that was entitled to the benefit of such last-named grant, the lands in dispute became a part of the public domain, in virtue of the orders subsequently made by the secretary of the interior, and were thereafter open to entry under the homestead and pre-emption laws of the United States.

It is ordered that the verdict heretofore returned by the jury in this case be set aside, and a new trial awarded.

Judge BUNN authorizes me to announce his concurrence in the views herein expressed.

Similar orders were made at the same time in *Wisconsin Central Railroad Company* v. *L. P. Lentz* and *Wisconsin Central Railroad Co.* v. *Edward Bekken,* which were cases in ejectment, and involved the same questions.